THE STATE OF OHIO, APPELLEE, *v.* HOLMES, APPELLANT.

(No. 85AP-549—Decided
February 24, 1987.)

*Michael Miller,* prosecuting at-
torney, and *Alan C. Travis,* for ap-
pellee.

*Randall M. Dana,* public defender,
*Jerry L. McHenry* and *John A. Bay,*
for appellant.

McCORMAC, J. Defendant-appel-
lant, Timothy James Holmes, was
found guilty by a jury of aggravated
robbery with a firearm specification, in
violation of R.C. 2911.01, and ag-
gravated murder with a death penalty
specification, in violation of R.C.
2903.01(B). After a mitigation hearing,
the jury recommended that appellant
receive a life sentence, without
possibility of parole for thirty full
years, for the aggravated murder. The
trial judge imposed the recommended
sentence, with additional consecutive
sentences for the aggravated robbery
conviction and the firearm specifica-
tion.

Upon appeal, appellant filed a mo-
tion with this court requesting that the
case be remanded to the trial court for
the issuance of a separate opinion as to
why the mitigating factors outweighed
the aggravating circumstances. Ap-
pellant argued that the filing of such a
separate opinion was required by R.C.
2929.03(F) under the particular cir-
cumstances of appellant's conviction,
and that the judgment of the court
below was not final until such opinion
was filed. This court rejected ap-
pellant's argument in *State* v. *Holmes*
(1986), 30 Ohio App. 3d 26, 30 OBR 64,
506 N.E. 2d 276.

Appellant then sought a writ of
mandamus in the Ohio Supreme Court
ordering this court to remand the case
to the trial court for the issuance of an
R.C. 2929.03(F) separate opinion. The
petition was dismissed, and appellant
is now appealing his conviction.

Kevin Odoms, a state's witness,
testified that, on June 3, 1984, he was
approached by appellant while playing
basketball at the Windsor Terrace
apartment complex. Appellant, Odoms
and two or three other young men then
took a friend to work. While driving
downtown, they ran out of gas on
Town Street. Appellant suggested that
they take a taxi home and the group
proceeded to the Greyhound Bus Sta-
tion. They took a taxi from there back
to the Windsor Terrace area, where
everyone except Odoms and appellant
exited the taxi. Appellant then told the
driver to go to his girlfriend's house in
another area of the complex. The
driver missed the street and appellant
instructed him to turn around in an
alley. The driver pulled into the alley
and stopped. Odoms suggested that
they walk the rest of the way to ap-
pellant's girlfriend's house, as it was
nearby. Appellant refused, stating that
the cab driver would take them. Odoms
then left the cab for a short while and,
when he returned, appellant was
standing outside the cab. Odoms again
told appellant "to pay the man." Ap-
pellant refused and pushed Odoms
back into the cab, to the rear
passenger's side, and appellant then

entered at the rear driver's side. Odoms again stated, "Why can't you just pay him," and the driver said, "Are you going to pay me or what." Appellant then stated, "I am going to do it like this," and shot the driver in the back. Odoms got out of the cab and ran out of the alley and down the street. Appellant caught up with him and they both fled the scene.

Odoms testified that he later contacted an attorney to turn himself in. He was contacted by the police and agreed to cooperate by wearing a "wire" and tape recorder. Odoms met with appellant and their conversation was recorded by the police.

On cross-examination, the following exchange took place between Odoms and defense counsel:

"Q. Did you talk to them about Mr. Haller and the musical instruments and the gun that you stuck in Mr. Haller's face when you took his van and the music equipment?

"A. No, sir, I didn't.

"Q. What did you talk to them about?

"A. I didn't take it.

"Q. You didn't take it. That means you did not stick a gun in Mr. Haller's face?

"A. Yes, sir.

"Q. Isn't it true, Kevin, that you are an armed robber? That is the way you make your living?

"A. No, sir."

Later, defense counsel pointed to a spectator in the courtroom and asked Odoms if he had ever robbed him. Odoms denied robbing the spectator. The state did not conduct a redirect examination of Odoms.

Richard Haller, called as a witness by the state, testified that he was robbed on May 31, 1984. When handed a picture of Odoms, Haller testified that this was not the person who had robbed him. He stated he was positive of this fact and wrote "this is not the person who robbed me" on the back of the picture. Appellant's objection to the admission of this photo was overruled by the trial court.

Columbus Police Detective Michael Elkins testified that Kevin Odoms was wired with both a micro-cassette and a tape cassette recorder for his conversation with appellant. Detective Elkins listened to the conversation as it was taking place. The two recordings produced were accurate reproductions of the conversation he overheard, although some portions were inaudible. A transcript was prepared, State's Exhibit 14-C, after going over the tape recordings many times and comparing the transcript with both recordings. Detective Elkins stated that State's Exhibit 14-C was an accurate transcript of the recordings.

During the trial, the jurors listened to the recordings both through individual listening devices and through two speakers located in the courtroom. As an aid to their listening, they were each provided with a copy of State's Exhibit 14-C. Defense counsel objected to the use of the transcript. The trial court overruled the objection, and the jurors were permitted to read the transcript while listening to the tape.

Lander Woods testified that, on June 3, 1984 was installing a radio in his car near the alley at the Windsor Terrace apartment complex. He heard a car pull up and saw that it was a cab. The cab driver was in the front seat and two black men were in the back seat. Woods testified that the two men left the cab, but returned later. He heard a "pop" and turned around. He saw that the person on the rear driver's side had his hand extended over the seat and was armed with a gun. He then witnessed the second shot. He also heard the defendant state, "give it here" or "give it up."

The jury returned verdicts of guilty on each count. Appellant raises the following assignments of error:

"1. The trial court erred by deny-

ing appellant's request for a continuance to secure the appearance of critical defense witnesses and by denying appellant's motion to reopen [his] case to present these witnesses.

"2. The trial court erred when it denied appellant's motion to suppress the tape-recorded statements of appellant obtained in violation of his right to the assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.

"3. The trial court erred by allowing the jury to receive and review what was purported to be a transcript of State's Exhibit 14-C.

"4. The trial court erred by failing to exclude from evidence a photograph of Kevin Odoms, and Richard Haller's testimony that Mr. Odoms was not the man who robbed him.

"5. The trial court erred by failing to exclude from evidence photographs of the victim and the victim's bullet-pocked and blood-stained shirt.

"6. The trial court erred by permitting the jurors to be questioned during voir dire as to their willingness or ability to impose a capital penalty.

"7. The trial court erred by overruling appellant's pre-trial motion to dismiss the indictment on the grounds that Ohio's death penalty statute is violative of the United States and Ohio Constitutions.

"8. The trial court erred by failing to write and file an opinion as required by Ohio Revised Code Section 2929.03(F).

"9. The trial court erred by overruling appellant's motion for judgment of acquittal of aggravated robbery and aggravated murder."

In his first assignment of error, appellant argues that the trial court erred by denying his request for a continuance to secure the appearance of critical defense witnesses and by denying his motion to reopen his case. During the trial on Thursday, March 28, 1985, at 9:20 a.m., defense counsel asked for a thirty to forty-five minute continuance. He stated that he expected Anthony Berry to testify. Apparently Berry's subpoena incorrectly listed his name as Tony Murphy. In addition, defense counsel stated that he recently learned of a potential witness named Earl King. He asked for a reasonable continuance to permit an opportunity to find these witnesses.

The trial court, however, overruled the motion. Defense counsel then proffered into the record that Berry's testimony would impeach Steven Smith, a prosecution witness, and King would testify that Odoms had blood-stained clothing and was carrying a gun. After the trial court overruled appellant's motion for a continuance, appellant rested his case without presenting evidence. The court was recessed until Monday, April 1, 1985. On that date, appellant proffered into the record that his witness, Anthony Berry, was present at court at 9:42 a.m. on March 28, 1985. Appellant then requested that the court grant him leave to reopen his case because witness King was present in court and willing to testify. Appellant stated that he needed only ten minutes with this witness. The court, however, overruled appellant's motion to reopen his case.

The allowance of a continuance is a matter that is entrusted to the sound discretion of the trial court. *State* v. *Unger* (1981), 67 Ohio St. 2d 65, 21 O.O. 3d 41, 423 N.E. 2d 1078. When evaluating a motion for a continuance, the court should consider:

"* * * the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to

the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case. * * *" *Id.* at 67-68, 21 O.O. 3d at 43, 423 N.E. 2d at 1080.

In the instant case, on March 28, 1985, appellant asked for only a short thirty to forty-five minute delay. There was no inconvenience to the litigants, witnesses, opposing counsel or the court, inasmuch as after the continuance was refused the court recessed the trial until the following Monday, April 1, 1985. Furthermore, the requested delay was for the apparent legitimate reason of calling a defense witness who was improperly subpoenaed because defense counsel had originally issued a subpoena under the wrong name. According to defense counsel in his motion for a continuance, a subpoena had later been reissued under the correct name which was not served. However, defense counsel stated that appellant's family had spoken to the witness who had promised to voluntarily appear at 9:00 a.m. It was then 9:20 a.m. and the request was for a thirty to forty-five minute continuance. The trial court, without objection by the state, summarily overruled the motion and stated that the trial would proceed. That ruling was made prior to the proffer. Defense counsel also stated then that they were searching for another defense witness named Earl King. After the proffer, the trial court stated that it would be delighted to hear the testimony of these witnesses if they showed up but that it was not going to wait for them. Paradoxically, the trial court then recessed the jury until Monday at 9:00 a.m. On Monday, defense counsel stated in the record that Berry had showed up on Thursday at 9:42 a.m., after about half the jury had left. The other witness, King, was present on Monday and ready to testify;

defense counsel stated that the testimony would take ten minutes and would be as proffered. Once again, without objection of the state, the trial court summarily denied appellant the opportunity to reopen his case after stating: "Certainly through no fault of the defense the witnesses were not available when it was time to call them * * *." One can only conclude that the trial court was more interested in its time than in allowing a full presentation of the evidence even though it was a death penalty case. While it would be nice if everything could proceed strictly according to schedule, and while it is recognized that trial judges have demanding dockets which are seriously eroded by lengthy trials, one is reminded of the old adage: "Penny wise and pound foolish."

The trial court, in overruling appellant's request, deprived appellant of the testimony of two witnesses who may have raised a doubt as to whether Odoms or appellant fired the fatal shot. Given the slight inconvenience and no evidence that the reasons were other than legitimate, the trial court abused its discretion in refusing to allow the testimony. The "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. * * *" *Lockett* v. *Ohio* (1978), 438 U.S. 586, 604. Even though the final verdict was not a death sentence, it was the next most severe punishment — thirty years without parole.

The state argues that the lower court did not err because the additional evidence sought to be admitted would have been obvious falsification. However, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact, not for the court. *State* v. *DeHass* (1967), 10 Ohio St. 2d 230, 39 O.O. 2d 366, 227 N.E. 2d 212, paragraph one of the syllabus. Thus, the trial court, in

refusing to grant a continuance and in refusing to permit appellant to reopen his case, abused its discretion and denied appellant the opportunity to present evidence which was relevant to the defense.

Appellant's first assignment of error is sustained.

In his second assignment of error, appellant argues that the tape-recorded statements he made to Odoms were obtained in violation of his Sixth Amendment right to counsel. The facts indicate that an arrest warrant was pending against appellant at the time that Odoms was wired. Appellant was not, however, under indictment.

The United States Supreme Court set out the rule that the Sixth Amendment right to counsel attaches at all critical stages of a prosecution, even before trial, in *Massiah* v. *United States* (1964), 377 U.S. 201. This principle was refined in *Kirby* v. *Illinois* (1972), 406 U.S. 682. In that case, the Supreme Court held that a person's Sixth and Fourteenth Amendments right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Id.* at 689-690. In *Kirby,* the court held that a police station show-up that occurred after the defendant's arrest, but before he had been indicted or otherwise formally charged, did not violate his Sixth Amendment right to counsel. More recently, in *Maine* v. *Moulton* (1985), 474 U.S. 159, the Supreme Court held that recorded, post-indictment statements to an undercover informant were protected by the Sixth Amendment right to counsel, even if the statements were initiated by the defendant himself and even if the police had other legitimate reasons for listening to the statements.

Appellant argues that the issuance of an arrest warrant constitutes the initiation of adversary judicial proceedings and, thus, his Sixth Amendment right to counsel had attached. This exact argument was rejected by the Sixth Circuit Court of Appeals in *United States* v. *Reynolds* (C.A. 6, 1985), 762 F. 2d 489. The court reasoned that, since the *Kirby* court found no right-to-counsel violation when the defendant was actually under arrest, the mere issuance of an unexecuted arrest warrant could not invoke the right to counsel. *Id.* at 493.

Adopting this analysis, appellant's Sixth Amendment right to counsel had not attached, as formal judicial proceedings had not been initiated against him. The mere issuance of an arrest warrant, prior to indictment, does not invoke the Sixth Amendment right to counsel. Therefore, appellant's second assignment of error is overruled.

In his third assignment of error, appellant argues that the trial court erred in allowing the jury to review State's Exhibit 14-C, the transcript of the conversation between Odoms and appellant.

Evid. R. 1002, the "best evidence rule," provides:

"To prove the content of a writing, recording, or photograph, *the original* writing, recording, or photograph *is required,* except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio." (Emphasis added.)

The tape recordings themselves were the best evidence of their contents, not the transcript. The Cuyahoga County Court of Appeals has addressed the use of transcripts in *Harleysville Mut. Ins. Co.* v. *Santora* (1982), 3 Ohio App. 3d 257, 3 OBR 289, 444 N.E. 2d 1076. In holding that the admission of a transcript was reversible error, the court noted that the

transcript was not prepared by an objective third party and the original recording was available and audible. *Id.* at 261, 3 OBR at 294, 444 N.E. 2d at 1081. Further, the court emphasized that the transcript could not "capture or preserve nuance, voice tone, emphasis, evasion, faltering, or emotion." *Id.*

In the instant case, the transcript was likewise not prepared by an objective third party. Also, the original recordings were available, even if not fully audible.

On the other hand, in *State* v. *Blankenship* (May 22, 1985), Medina App. No. 2050, unreported, the court found no error in the use of transcripts. The *Blankenship* court relied on *United States* v. *Turner* (C.A. 9, 1975), 528 F. 2d 143, wherein the federal court held that the use of transcripts as listening aids was not error, as well as noting that the transcripts were evidence of the occurrence of the actual crime, the crime of conspiracy. *Blankenship, supra,* at 6, fn. 1. In *Turner,* the appellate court was influenced by the procedural safeguards adopted by the trial court, including the methodical review of the tapes and transcripts in defense counsel's presence, the marking of corrections on the transcripts, and the eventual stipulation by all counsel that the transcripts were an accurate rendition of the tapes. *Id.* at 167.

The trial court herein did not follow the procedural safeguards emphasized by the *Turner* court, although defense counsel was given access to the tapes and transcripts with an opportunity to point out any differences. A problem with the record is that the court reporter's version of the tapes played in the court room is almost unintelligible. Apparently, the court reporter was not given earphones as was the jury who presumably heard the tapes better. However, in light of the fact that appellant is unable to point out any material differences between the tapes and the transcript supplied to the jury as listening aids, there was no prejudicial error. The use of a typed transcript as a visual aid to the jury in listening to the playback of the recorded communication is a matter within the sound discretion of the trial court. *United States* v. *John* (C.A. 8, 1975), 508 F. 2d 1134, 1140-1141. Only the tapes were sent to the jury room. The written transcripts were used only as listening aids.

Appellant's third assignment of error is overruled.

In his fourth assignment of error, appellant argues that the trial court erred by failing to exclude from evidence a photograph of Odoms, and Richard Haller's testimony that Odoms was not the man who robbed him. The state called Odoms to testify as to the facts and circumstances of the slaying. On direct examination, Odoms admitted that he had been convicted of petty theft. On cross-examination of Odoms, defense counsel pointed to a spectator in the courtroom named Haller and, without objection, asked Odoms if he had robbed him by gunpoint on May 31, which Odoms denied. The state then called Haller as a state's witness. Haller testified that he was robbed on May 31, 1984, but that Odoms was *not* the man who had robbed him. He wrote this on the back of Odoms' picture, which was admitted into evidence. (Haller's testimony that appellant looked like the robber was not admitted into evidence.)

Appellant argues that the picture and testimony served only to bolster Odoms' credibility as a witness and, thus, was improper under the Rules of Evidence. Evid. R. 608(B) provides:

"Specific instances of the conduct of a witness, for the purpose of attacking *or supporting* his credibility, other than conviction of crime as provided in

Rule 609, *may not be proved by extrinsic evidence.* They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, *be inquired into on cross-examination of the witness* (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." (Emphasis added.)

The state asserts that appellant is estopped from asserting this error because his improper conduct initiated the response. We agree that the cross-examination of Odoms in relation to Haller was improper. Defense counsel had no evidence to support his innuendo that Odoms held up Haller and, thus, the accusation was highly improper. However, it is rare that the theory that two wrongs make a right is desirable in a criminal trial. The state was partly to blame for the admission of the improper cross-examination of Odoms by failing to object, arguably inviting the error so that Haller could testify that, not only did Odoms not rob him, but that appellant resembled his robber. Fortunately, the trial court excluded the latter testimony.

In any event upon retrial, both the improper cross-examination of Haller and the improper use of Haller's extrinsic testimony to support Odoms' credibility can be eliminated. See *State* v. *Lewin* (1984), 11 Ohio St. 3d 172, 11 OBR 486, 464 N.E. 2d 552. However, the error in admitting Haller's extrinsic testimony was not prejudicial, and the case would not have been reversed solely for this error.

Appellant's fourth assignment of error is overruled.

In his fifth assignment of error, appellant argues that the trial court erred by failing to exclude from evidence photographs of the victim and his shirt. The admission or exclusion of photographs of the murder victim rests within the sound discretion of the trial court. *State* v. *Hill* (1967), 12 Ohio St. 2d 88, 41 O.O. 2d 369, 232 N.E. 2d 394, paragraph two of the syllabus. Although appellant argues that the photographs should have been excluded as they were of no probative value, the state correctly maintains that it had to show a purposeful killing. The fact that the victim was shot twice, as evidenced by the photos, corroborated the state's claim of aggravated murder. In addition, the Ohio Supreme Court held in *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768, paragraph seven of the syllabus:

"Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number."

Since the photographs were of probative value in assisting the trier of fact, the trial court did not abuse its discretion in admitting them into evidence.

Appellant's fifth assignment of error is overruled.

In his sixth assignment of error, appellant argues that the trial court erred by permitting the jurors to be "death qualified" during the voir dire examination. R.C. 2945.25 provides in part:

"A person called as a juror in a criminal case may be challenged for the following causes:

"* * *

"(C) In the trial of a capital offense, that he unequivocally states that under no circumstances will he follow the instructions of a trial judge and

52

consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard."

The Ohio Supreme Court has held that such a process, prior to the guilt phase of a bifurcated capital prosecution, does not deny a capital defendant a trial by an impartial jury. *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264, paragraph two of the syllabus; *Maurer, supra,* paragraph two of the syllabus. More recently, this court in *State, ex rel. Miller,* v. *Gillie* (1986), 24 Ohio App. 3d 121, 24 OBR 192, 493 N.E. 2d 327, discussed the "death qualification" issue. This court noted that a criminal defendant is not entitled to impanel jurors who, under any circumstances, will not follow the instructions of a trial judge to consider fairly the imposition of a death sentence. *Id.* at paragraph two of the syllabus.

Appellant's sixth assignment of error is overruled.

In his seventh assignment of error, appellant argues that Ohio's death penalty statute violates both the United States and Ohio Constitutions. However, the Ohio Supreme Court has unequivocally stated that Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution. *Jenkins, supra,* paragraph one of the syllabus; *Maurer, supra,* paragraph one of the syllabus.

Specifically, appellant argues that the Ohio death penalty statute is unconstitutional because it gives the prosecutor the uncontrolled discretion to decide whom to indict for capital murder. In *Jenkins, supra,* the court rejected this argument following the mandate of *Gregg* v. *Georgia* (1976), 428 U.S. 153. The court held that prosecutorial discretion does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious, or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. *Jenkins, supra,* at 169-170, 15 OBR at 315-316, 473 N.E. 2d at 273-274.

Appellant further argues that the prosecutorial discretion is particularly objectionable in light of the fact that the victim was white while appellant is black. The issue of discrimination in the application of the death penalty will soon be decided by the United States Supreme Court as it granted certiorari on July 7, 1986 in the case of *McCleskey* v. *Kemp* (C.A.11, 1985), 753 F. 2d 877, certiorari granted (1986), 478 U.S. —, 92 L. Ed. 2d 737▪ The *McCleskey* court held, *inter alia,* that the statistical evidence presented was insufficient to support a claim of unconstitutionality in the death sentencing process in Georgia. The court noted that the system as a whole operated in a rational manner and not in a manner that could be fairly labeled arbitrary or capricious. *Id.* at 898. Thus, the defendant's petition did not surmount the threshold burden of stating a claim. *Id.* Because the Ohio system operates in a constitutional manner, appellant's seventh assignment of error is overruled.

In his eighth assignment of error, appellant argues that the trial court erred by failing to file a separate opinion as required by R.C. 2929.03(F). Appellant's argument was rejected by

this court on his motion to remand. *State* v. *Holmes, supra.* Furthermore, the Ohio Supreme Court has recognized that there is no requirement that a jury, when recommending a sentence of life imprisonment over the imposition of a death penalty, identify the existence of mitigating factors and why those factors outweigh the aggravating circumstances. See *Jenkins, supra,* at 175-176, 15 OBR at 321-322, 473 N.E. 2d 278-279. We reaffirm our earlier decision that R.C. 2929.03 does not require that the trial court issue a separate written opinion with specific findings in a situation in which the jury has recommended that the defendant be sentenced to life imprisonment.

Appellant's eighth assignment of error is overruled.

In his ninth assignment of error, appellant argues that the trial court erred by overruling his motion for judgment of acquittal of aggravated robbery and aggravated murder. "A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *State* v. *Eley* (1978), 56 Ohio St. 2d 169, 10 O.O. 3d 340, 383 N.E. 2d 132, syllabus. Upon review of the record, we find that there is sufficient evidence upon which to convict appellant of both aggravated robbery and aggravated murder.

R.C. 2903.01(B) provides:

"No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery or robbery * * *."

R.C. 2911.01(A)(1) provides:

"(A) No person, in attempting or committing a theft offense, * * * shall do either of the following:

"(1) Have a deadly weapon or dangerous ordnance * * * on or about his person or under his control;

"* * *"

Theft is knowingly obtaining or exerting control *over either property or services* with purpose to deprive the owner of such. R.C. 2913.02(A).

The state presented the testimony of Lander Woods. He heard appellant state "give it up" before appellant shot the victim. Furthermore, the cab driver was not paid for his services. Thus, the state established both the theft of property and the theft of services.

Appellant's ninth assignment of error is overruled.

Appellant's first assignment of error is sustained. Appellant's second, third, fourth, fifth, sixth, seventh, eighth, and ninth assignments of error are overruled. The judgment of the trial court is reversed and the cause is remanded to the trial court for a new trial consistent with this opinion.

*Judgment reversed and cause remanded.*

WHITESIDE and GORMAN, JJ., concur.

ROBERT H. GORMAN, J., of the Court of Common Pleas of Hamilton County, sitting by assignment in the Tenth Appellate District.