OPINION *Page 2 
{¶ 1} Appellant Christopher "Snake" Webb appeals his conviction for murder in the Court of Common Pleas, Richland County. The relevant facts leading to this appeal are as follows.
 {¶ 2} On March 22, 2006, Travis Harris was fatally shot on the outside stairwell of a residence on South Franklin Street in Mansfield, Ohio. The events leading to the shooting commenced about a week and a half earlier, shortly after midnight on March 11, 2006. At that time, appellant had visited a Mansfield tavern called "Lulu's Café" and gotten into an argument with Yazmin White over accusations that appellant had been "messing with" Yazmin's girlfriend.
 {¶ 3} Yazmin's older brother, Benetitus White, was also at Lulu's on the night of March 11th. Benetitus was not only aware of the issues between Yazmin and appellant, but had also been told by his friend Jeremiah Conrad that appellant had similarly been involved with Jeremiah's girlfriend. While Yazmin and appellant were arguing, Benetitus called Jeremiah to advise him that appellant was at Lulu's.
 {¶ 4} Benetitus then got involved in the argument between Yazmin and appellant, which evolved into a fistfight outside the bar. Appellant's brother, Anthony Webb, also became involved in the altercation. The fight broke up when an unidentified person fired gunshots. Police were summoned, and Yazmin was ultimately charged with assault, while Benetitus was arrested on an outstanding warrant. *Page 3 
 {¶ 5} On March 22, 2006, following a small get-together at 204 South Franklin, the residence of Shirley Almanson,[1] Benetitus was talking with Travis Harris and Sonji Mack (Almanson's boyfriend) in front of the house. A tan and gray Chevrolet Impala slowly drove past the three individuals, and then did the same thing from the opposite direction a few minutes later. As the Impala made these passes down Franklin, Benetitus saw appellant in the passenger seat.
 {¶ 6} The car continued to a nearby alley, into which it turned and stopped. Appellant emerged with three other persons. Appellant and his companions began firing their firearms toward Travis Harris, Benetitus, and Mack across an empty lot. Benetitus and Mack ran for cover behind the house, while Harris attempted to walk up some exterior stairs. Benetitus started to run toward the attackers, but returned to the house. He discovered the dying Harris inside, being tended to by Shirley Almanson. Appellant left the State of Ohio after the shooting.
 {¶ 7} The Richland County Grand Jury indicted appellant for aiding and abetting the murder of Travis Harris, with a firearm specification, on May 26, 2006. In September 2006, after appellant had been extradited from Wisconsin, appellant was arraigned, and the trial court appointed defense counsel. Appellant pled not guilty. A jury trial commenced on February 1, 2007, lasting for three days.
 {¶ 8} On February 8, 2007, the jury returned a verdict of guilty as charged. Appellant was thereupon sentenced to fifteen years to life, consecutive to a three-year sentence on the firearm specification. *Page 4 
 {¶ 9} On March 6, 2007, appellant filed a notice of appeal. He herein raises the following five Assignments of Error:
 {¶ 10} "I. THE TRIAL COURT ERRED PREJUDICIALLY WHEN IT REFUSED TO GRANT THE APPELLANT A CONTINUANCE OF THE TRIAL TO SECURE NECESSARY WITNESSES.
 {¶ 11} "II. THE TRIAL COURT ERRED PREJUDICIALLY WHEN IT ALLOWED THE JAILHOUSE INFORMANT TO OPINE AT GREAT LENGTH ABOUT APPELLANT'S BAD CHARACTER.
 {¶ 12} "III. THE TRIAL COURT ERRED PREJUDICIALLY WHEN IT REFUSED TO CHARGE THE JURY ON RECKLESS HOMICIDE.
 {¶ 13} "IV. THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 14} "V. THE DEFENDANT WAS DEPRIVED EFFECTIVE ASSISTANCE OF COUNSEL."
 I. {¶ 15} In his First Assignment of Error, appellant contends the trial court erred in denying his January 24, 2007 motion to continue the trial for the purpose of securing defense witnesses. We disagree.
 {¶ 16} The grant or denial of a continuance is a matter entrusted to the broad, sound discretion of the trial court. State v. Hoff, Fairfield App. No. 02-CA-89, 2003-Ohio-3858, ¶ 15, citing State v. Unger (1981), 67 Ohio St.2d 65, 423 N.E.2d 1078. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Page 5 Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. In determining whether a trial court abused its discretion in denying a motion for a continuance, an appellate court should consider the following factors: (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconveniences to witnesses, opposing counsel and the court; (4) whether there is a legitimate reason for the continuance; (5) whether the defendant contributed to the circumstances giving rise to the need for the continuance; and other relevant factors, depending on the unique facts of each case. Unger at 67-68, 423 N.E.2d 1078; State v.Holmes (1987), 36 Ohio App.3d 44, 47-48, 521 N.E.2d 479.
 {¶ 17} In the case sub judice, eight months elapsed between the indictment and the trial. Appellant waived his speedy trial rights in late October 2006, about two months after his arraignment. At the time of appellant's motion to continue, one previous continuance had been granted, at the State's request. The trial court conducted a hearing on appellant's request to continue on January 29, 2007, at which time the following exchange took place between the court and defense counsel:
 {¶ 18} "THE COURT: * * * This case is set for jury trial on murder with a firearms specification for this Thursday. Mr. Brown on January 24th filed a motion to continue for the reason the defendant desired to have more time to locate witnesses and prepare for trial. The prosecutor has opposed that motion.
 {¶ 19} Mr. Brown, did you have specific witnesses that you were looking for, or someone you had in mind?
 {¶ 20} "MR. BROWN: Judge, I cannot identify any specific witness. *Page 6 
 {¶ 21} "THE COURT: It is true, I believe, that you spent a substantial amount of time running down leads your client has given you and looking for witnesses and talking to potential witnesses as he's given them to you.
 {¶ 22} "MR. BROWN: I have tried to find witnesses, yes.
 {¶ 23} "THE COURT: You have done everything you can to specifically locate all the witnesses specifically identified to you?
 {¶ 24} "MR. BROWN: I believe so, Judge." Tr., January 29, 2007, at 2.
 {¶ 25} Appellant's defense counsel thus gave little indication at the time of the motion that any witness acquisition would be forthcoming, despite his stated efforts to diligently assist his client in this aspect. Upon review of the record, we are unable to find the denial of appellant's motion to continue constituted an abuse of discretion.
 {¶ 26} Appellant's First Assignment of Error is therefore overruled.
 II. {¶ 27} In his Second Assignment of Error, appellant contends the trial court erred in allowing certain testimony against him by a jailhouse informant. We disagree.
 {¶ 28} The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173,180, 31 OBR 375, 510 N.E.2d 343. As a general rule, all relevant evidence is admissible. Evid.R. 402. Our task is to look at the totality of the circumstances in the particular case and determine whether the trial court acted unreasonably, arbitrarily, or unconscionably in allowing the disputed evidence. See State v. Oman (Feb. 14, 2000), Stark App. No. 1999CA00027.
 {¶ 29} The prosecution witness challenged by appellant in the case sub judice is Jerrell Gray, who testified as to incriminating statements made by appellant while the *Page 7 
two men were being held at the Richland County Jail. Gray testified that he had not previously met appellant. Tr. at 394, 406. Gray testified that appellant thought the Lulu's Cafe beating by Benetitus had made appellant look soft on the street, and that appellant would sometimes stand up to other inmates by bragging that he had "already popped a mother-fucker." Tr. at 399, 407. Appellant directs us to the following exchange during Gray's direct examination, as Gray recounted his conversations with appellant at the jail:
 {¶ 30} "Q What is his [appellant's] attitude when he is telling you this, what is Snake's demeanor when he goes through everything?
 {¶ 31} "A His attitude is he (sic) trying to exude that he's hard. He's trying to let you know that he meant it, and to be honest with you, I honestly didn't really pay any attention to it. Then I really got to looking at him and listening at him. The more I looked and the more I listened, I looked in his eyes and I seen, you know, you could just see — it was like he was angry in his eyes. He just had that look like it was just like he enjoyed it. He felt what he was saying, he meant what he was saying. I will never forget his eyes, I will never forget that, the look that man had in his eyes, I will never forget that.
 {¶ 32} "Q Did he show any remorse at all?
 {¶ 33} "A No, he didn't show any remorse. I mean, I have been in the military
 {¶ 34} "MR. BROWN: Objection.
 {¶ 35} "THE COURT: Overruled. You are objecting to him saying he's been in the military? *Page 8 
 {¶ 36} "MR. BROWN: Well, he asked a yes or no question, and he said yes and then he's going off somewhere. I don't know where he's going.
 {¶ 37} "THE COURT: If you are responding to the question about did he show any remorse you can go ahead and finish your answer.
 {¶ 38} "A The point I was about to make, I've been in the military, and I was trained to kill. It's just like if you engage in war, that's your job to kill someone. That's what the government pays you to do. When you engage in war, and you shoot your enemy, as a person, somewhere along the line when all this is said and done, everything is over with, the human factor of you takes over. You may have did your job, but you took lives, a lot of lives. That never leaves you what you did. Somewhere along the line it kicks in, hey, you know, I killed people. Even though that was your job, you were trained, you were paid to do that, the remorse part of you, knowing you killed people, even though they were your so-called enemies, you still killed a person. Somewhere along the line, whether you do that in private, whether you share that with a family member or counselor or something, you are still remorsing the fact that you had to take someone's life.
 {¶ 39} "MR. BROWN: Your, Honor, I'm going to object again.
 {¶ 40} "THE COURT: Overruled. Go ahead to the next question.
 {¶ 41} "Q Did you see any of that remorse of him?
 {¶ 42} "A That was my whole point about that, I never saw that.
 {¶ 43} "Q Were you looking for it?
 {¶ 44} "A I totally expected that. I mean, you're sitting there and saying you killed someone, by then you had time to calm down, and that was a while back, you've *Page 9 
had time to calm down, realize that, hey, I took somebody's life, you know, I just never saw that. That's the thing that bothered me with him." Tr. at 403-406.
 {¶ 45} Appellant challenges the above testimony as consisting of improper character evidence. Evid.R. 404(A) provides, with certain exceptions, that evidence of a person's character is not admissible to prove the person acted in conformity with that character. The allowance of the aforecited testimony of Gray, when read in isolation, is clearly problematic in light of Evid.R. 404(A). However, as we previously noted, Gray testified at other points that appellant had bragged about "popping" somebody. See Tr. at 400, 407. Moreover, as further discussed in regard to appellant's manifest weight claim, infra, the State presented two additional jailhouse witnesses: Robert Butler and Charles Gordon. Both of these men recounted, inter alia, appellant's discussions about intending to shoot Benetitus White but striking Harris instead. See Tr. at 153; 368.
 {¶ 46} Therefore, upon review of the entire record, we find the cited passage of Gray's testimony constituted harmless error which does not mandate reversal.
 {¶ 47} Appellant's Second Assignment of Error is overruled.
 III. {¶ 48} In his Third Assignment of Error, appellant argues the trial court erred in refusing to instruct the jury on the offense of reckless homicide. We disagree.
 {¶ 49} When reviewing a court's refusal to give a requested jury instruction, an appellate court considers whether the trial court's refusal to give said instruction was an abuse of discretion under the facts and circumstances of the case. State v. Wolons (1989),44 Ohio St.3d 64, 68. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not *Page 10 
merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 50} There is no dispute in the present appeal that reckless homicide is a lesser included offense of murder. See, e.g., State v.Anderson, Butler App. No. CA 2005-06-156; 2006-Ohio-2714, ¶ 9. Nonetheless, a party is not entitled to an instruction on a lesser included offense unless the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. Anderson, supra, at ¶ 10. In making this determination, the court must view the evidence in the light most favorable to a defendant. Id. But an instruction on a lesser included offense is not warranted every time "some evidence" is presented to support the inferior offense. See State v. Shane (1992),63 Ohio St.3d 630. There must be "sufficient evidence" to "allow a jury toreasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense." (Emphasis sic.) Id. at 632-633.
 {¶ 51} Thus, in order for the trial court to have instructed the jury in this case on reckless homicide, the evidence at trial must have supported the theory that appellant acted recklessly, while not upholding the theory that he acted purposely when he aided and abetted the shooting of Travis Harris. Appellant's essential argument is that the .22 caliber shot fatally striking Harris from a distance of approximately 250 feet could have allowed the jury to conclude the incident was a "freak accident." Appellant's Brief at 20.[2]
 {¶ 52} As further analyzed in our redress of appellant's "manifest weight" claim in his fourth assigned error, infra, there was significant evidence before the court that *Page 11 
appellant acted with purpose to cause death in the shooting incident of March 22, 2006, particularly in regard to the State's theory that appellant and his companions traveled to South Franklin Street to exact revenge on Benetitus for the earlier bar fight, shooting Harris instead. "[T]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." State v. Turner (1997), Franklin App. No. 97APA05-709. We find upon review that no reasonable juror could have rejected the murder charge and concluded that the killing of Harris was merely reckless. Accordingly, we hold the trial court did not abuse its discretion in refusing to instruct the jury on the offense of reckless homicide.
 {¶ 53} Appellant's Third Assignment of Error is overruled.
 IV. {¶ 54} In his Fourth Assignment of Error, appellant maintains his conviction for murder was against the manifest weight of the evidence. We disagree.
 {¶ 55} Our standard of review on a manifest weight challenge to a criminal conviction is stated as follows: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. See also, State v. Thompkins (1997),78 Ohio St.3d 380, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175, 485 N.E.2d 717. *Page 12 
 {¶ 56} In the case sub judice, there is no dispute that Travis Harris died on the scene at 204 South Franklin from a gunshot wound which penetrated his back and lung. See testimony of Officer Richard Dittrich (Tr. at 337, et seq.) and Dr. Tae Lyong An (Tr. at 514, et seq.). The State presented a total of seventeen witnesses; no defense witnesses were heard. An early and essential witness at trial was Benetitus White, the apparent actual target of the Harris killing, who set the stage for the rift between the Webb brothers and the White brothers as the motive of the shooting, as well placing appellant in the car of gunmen. Benetitus also testified that he saw appellant exit the car, pull his sweatshirt hood over his head, and join in the gunfire directed at Benetitus, Mack, and Harris on the lighted street. See Tr. at 264-282. According to crime lab director Anthony Tambasco, investigators found five .32 caliber casings, with no discernable fingerprints, in the alley near South Franklin. Tr. at 243. Harris was actually struck by a .22 caliber bullet, although Tambasco noted that a .22 caliber revolver would not leave casings on the ground. Tr. at 249.
 {¶ 57} The State also called Detective Frank Parrella, who investigated the area surrounding the shooting and testified that Deborah Young, aka "Momma Pep," lives at nearby 235 Schmitt Court. Tr. at 440. Young is an aunt of appellant and his brother, Anthony. Id. The State thereupon called neighborhood resident Terry Clinage to the stand, who recalled seeing four or five black males running toward 235 Schmitt Court on the night of the shooting. Tr. at 448.
 {¶ 58} Furthermore, in addition to Jerrell Gray, as discussed in appellant's second assigned error, the State presented two additional jailhouse informants, Robert *Page 13 
Butler and Charles Gordon, who recounted appellant's conversations about the shooting.
 {¶ 59} Butler had been friends with Travis Harris, and following a jail church service, Butler made contact with appellant. Butler testified at trial that appellant claimed that Harris's death had been "accidental," in the sense that appellant meant to target someone else. Tr. at 153. On another occasion, appellant remarked to Butler that he would want to accept a deal if the charge were modified to manslaughter. Tr. at 157-158.
 {¶ 60} The final informant, Charles Gordon, had been an acquaintance of appellant's parents. Gordon introduced himself at the jail upon realizing who appellant was. Gordon testified at trial that appellant told him details of the events of March 22, 2006 and that he was planning to shoot Benetitus, but fatally struck Harris instead. Tr. at 367-370.
 {¶ 61} The essence of the case sub judice was the State's presentation of its accomplice liability theory against the defense strategy of arguing the existence of reasonable doubt, particularly as to the credibility of the informants. Upon review, we find the evidence reviewed in its entirety does not lead to a conclusion that the jury lost its way and created a manifest miscarriage of justice.
 {¶ 62} Accordingly, appellant's Fourth Assignment of Error is overruled.
 V. {¶ 63} In his Fifth Assignment of Error, appellant contends he was deprived of the effective assistance of trial counsel. We disagree. *Page 14 
 {¶ 64} Our standard of review is set forth in Strickland v.Washington (1984), 466 U.S. 668. Ohio adopted this standard in the case of State v. Bradley (1989), 42 Ohio St.3d 136. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel.
 {¶ 65} First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the proceeding is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the proceeding would have been different. An appellate court "* * * need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Bradley, supra, at 143, quotingStrickland, supra, at 697.
 {¶ 66} Appellant first urges that trial counsel failed to properly seek pre-trial suppression of the jailhouse informants in this case. However, "[w]here the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion." State v. Drummond (2006), 111 Ohio St.3d 14, 41,854 N.E. 2d 1038, 2006-Ohio-5084, quoting State v. Gibson (1980),69 Ohio App.2d 91, 95, 23 O.O.3d 130, 430 N.E.2d 954. Appellant herein fails to indicate what grounds could have been asserted for a suppression motion, or what would support such a motion in the record. *Page 15 
Assuming appellant is suggesting hypothetical suppression on the basis that the informants were state actors, we find all three informants consistently denied receiving any favors or deals from the prosecution. Appellant's claim of ineffective assistance in this regard must thus fail.
 {¶ 67} Appellant secondly contends that trial counsel was ineffective in seeking to withdraw as defense counsel, failing to obtain get a continuance of the trial, and failing to adequately raise the "ballistic improbability" of the shooting. Appellant's claims on these bases are bare allegations, with no compelling arguments in support. See App.R. 16(A)(7). Furthermore, appellant's contention as to "ballistic improbability" forces us to speculate as to potential evidence dehors the record, which an appellate court is not required to do upon a direct appeal. See, e.g., State v. Lawless, Muskingum App. No. CT2000-0037, 2002-Ohio-3686, citing State v. Cooperrider (1983), 4 Ohio St.3d 226,228, 448 N.E.2d 452.
 {¶ 68} Appellant's Fifth Assignment of Error is therefore overruled.
 {¶ 69} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Richland County, Ohio, is hereby affirmed.
 Wise, J. Gwin, P. J., and Farmer, J., concur. *Page 16 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed. Costs assessed to Appellant.
[1] Shirley Almanson is the mother of Aisha Gordon, Benetitus White's girlfriend at the time.
[2] We note appellant's ballistics argument is not supported by any references to the record. *Page 1