## State v. Susser
*[Cite as 8 AOA 68]*

*Case No. CA 11787*
*Montgomery County, (2nd)*
*Decided December 5, 1990*

*Lee C. Falke, Montgomery County Prosecuting Attorney, By: Lorine M. Reid, Assistant Prosecuting Attorney, Appellate Division, 41 N. Perry Street, Suite 315, Dayton, Ohio 45402, for Plaintiff-Appellee.*

*Dwight D. Brannon, Brannon, Hall & Tucker, Six South Patterson Boulevard, Suite 300, Dayton, Ohio 45402, for Plaintiff-Appellant.*

BROGAN, J.

Appellant Gary Susser was indicted on seven criminal charges, to wit:

(1) knowingly falsifying statements to the Grange Mutual Insurance Co. in regards to a claim for insurance proceeds in an amount exceeding $300 in violation of R.C. 2921.13(A)(10);

(2) falsifying statements to Cincinnati Insurance Co. for $5,000 or more in violation of R.C. 2921.13(A) (10);

(3) theft in the amount of $300 relating to the first count;

(4) knowingly possessing cocaine in violation of R.C. 2925.11(A) having previously been convicted of a drug abuse offense;

(5) having a weapon while under disability in violation of R.C. 2923.13(A)(3);

(6) possession of criminal tools in violation of R.C. 2923.24; and

(7) attempted grand theft from Cincinnati Insurance Co. in violation of R.C. 2913.02.

After a jury trial the appellant was found guilty of counts 2, 4, 6, and 7 and was acquitted of the other charges. The trial court merged counts 2 and 7 and counts 4 and 6 respectively for sentencing purposes with the

sentences to run concurrently. Susser appeals and raises thirteen assignments of error.

The facts underlying this case began on March 24, 1984, when the appellant reported to the Dayton Police Department that he had a burglary at his residence at 809 Troy Street. Appellant submitted a claim for insurance benefits with the Grange Mutual Insurance Company for the loss of numerous items of personal property including three weapons, to wit: a Springfield 03 Rifle #3452229, a British Enfield Rifle, #8328, and a Belgian shotgun, carved wood stock, #10035. Grange Mutual paid the appellant $1,350 for the weapons which appellant reported were stolen in the burglary.

On February 23, 1988, Montgomery County Sheriff deputies executed a search warrant at the appellant's residence, 4601 Merrick Drive in Harrison Township. A quantity of narcotics were confiscated along with the three weapons which appellant had reported as "stolen" to the Grange Mutual Insurance Company.

On June 9, 1988, the appellant entered into a plea agreement with the Montgomery County Prosecuting Attorney, whereby the appellant agreed to enter a plea of guilty by way of an information to a felony charge of drug abuse. Specifically, appellant agreed to plead guilty to using cocaine and Talwin on or about February 21, 1988. He also agreed to testify concerning who was responsible for other drugs found at his residence on February 23 and March 29, 1988. In exchange for the appellant's plea, the State of Ohio agreed not to charge appellant with any other criminal offenses relating to the February 23 and March 29, 1988 "incidents."

On November 20, 1988, appellant reported that someone had broken into his law office and had taken numerous items. On January 13, 1989, police officers executed a search warrant at appellant's residence and office and recovered drug paraphernalia and property which appellant had reported as stolen in the November 19, 1988 burglary.

On December 12, 1988, the appellant was placed on probation for a period of five years by Judge John Kessler. On April 7, 1989, the appellant was indicted on the insurance fraud charges and other related matters. On April 17, 1989, Judge Kessler filed a request that he be disqualified because he certified to the Ohio Supreme Court that the appellant was unfit to practice law. The administrative judge approved Judge Kessler's request and the matter was assigned to Judge John Meagher on the same date.

On April 25th, the appellant entered written pleas of not guilty and in the alternative, pleas of former jeopardy as to all counts except those involving the Cincinnati Insurance Company as the alleged victim.

In his first assignment, appellant contends the trial court improperly exercised jurisdiction over the appellant in Case No. CR-1215 and in revoking appellant's probation granted in Case No. 88-CR1370.

The administrative judge for a multi-judge division of the Common Pleas Court has authority to reassign any case to himself or any other judge of that court, by a journalized order stating a justifiable reason for the transfer. Failure by a party to assert on the record an objection to the reassignment at that party's first opportunity constitutes a waiver of that party's objection to the otherwise voidable transfer. *Berger v. Berger* (1981), 3 Ohio App. 3d 125. The appellant failed to object to the action of the administrative judge in a timely manner. The assignment is Overruled.

In his second assignment, appellant contends the trial court erred when it refused to permit the testimony of appellant's former counsel as to the parameters of the plea agreement which resulted in the appellant's pleading guilty to drug abuse on June 9, 1989 relating to the discovery of drugs at appellant's residence on February 23 and March 29, 1988. Appellant had moved to dismiss Counts IV and VI for the reason the June 1988 plea agreement required the dismissal of these charges.

Appellant sought to introduce the testimony of his former counsel, Louis Hoffman, about the details of the agreement and his "understanding" of that agreement. The trial court held that the agreement spoke for itself and that Mr. Hoffman's understanding of it was not relevant. (Tr. 185).

At the pretrial hearing conducted on May 30, 1989, the appellant introduced the plea agreement. (Exhibit A). It stated that in return for appellant's plea of guilty (to drug abuse) the State "will not charge Gary Susser with any other criminal offenses that relate to the above mentioned incidents which occurred on or about February 21, 22, or 23, 1988 and March 29, 1988." The incident which led to

appellant's indictment in this case occurred several months later on January 23, 1989.

At the pretrial hearing, appellant's counsel proffered that Hoffman would testify he was concerned about the charge of receiving and concealing stolen property as to guns and drug offenses, and that was the reason for the plea agreement. (Tr. 188).

There was no evidence the police discovered the drug paraphernalia in the searches conducted in February and March 1988. If they did not discover these items at that time, it could hardly have formed a basis for the June 1989 plea agreement. The police were not free to "bargain" appellant's violation of the law in the future.

Appellant contends in an unrelated argument the court erred when it failed to instruct the jury on the defenses of former jeopardy and "prior plea" agreement. There was no request for such instruction by the appellant. It was not plain error for the court not to have given the instruction. See, *State v. Long* (1978), 53 Ohio St. 2d 91. Also whether the state is barred from trying the appellant on double jeopardy grounds or because of a pretrial agreement is collateral to the issue of guilt or innocence and is a matter for resolution by the trial judge. See *Abney v. United States* (1977), 431 U.S. 61; *State v. Thomas* (1980), 61 Ohio St. 2d 254 (rev'd on other grounds in *State v. Crago* (1990), 53 Ohio St. 3d 243). The second assignment is overruled.

In appellant's third assignment he contends the trial court erred when it failed to suppress the evidence seized from the search of appellant's residence and office on January 23, 1989. Appellant contends the affidavit of Deputy James Brown failed to provide the issuing magistrate with a substantial basis for determining the existence of probable cause as is required by Crim. R. 41(C) and the Fourth Amendment of the United States Constitution. Appellant also contends that the trial court should have suppressed evidence which was seized by the police officers which evidence was not named as being subject to seizure under the search warrant. Appellant also contends that much of the information in the affidavit was "stale" information and therefore insufficient to serve as sufficient probable cause.

Appellant attacks the facial validity of the affidavit as being insufficient. Deputy Brown alleged the following facts in the affidavit filed on January 23, 1989:

"1. On Friday, 3-24-84, Gary Susser, DOB 10-14-53, SSN 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, 809 Troy Street, Dayton, Ohio 45404, reported a residential burglary to Dayton Police Department. As a result of the aggravated burglary, Gary Susser filed a claim (#7-1 223 7768) with Grange Mutual Insurance Company. Included in this claim, Gary Susser reported the following weapons were stolen as a result of the burglary:

"A. Springfield 03A3 Rifle, Remington 30-06, 1942, serial # 3452229.

"B. Enfield MKIV - Military British 303, 1941, serial # F8328.

"C. Shotgun, Jamessen & Son Belgian double barrel, carved wood stock D'Amasscus, serial # 10035.

"2. On 5-14-84, Grange Mutual Insurance Company paid Gary Susser the sum of $1,350 for said insurance claim on the weapons listed in paragraph # 1.

"3. On Tuesday, 2-23-88, the Affiant executed a Search Warrant at Gary Susser's residence, 4601 Merrick Dr., Harrison Twp., Montgomery County, State of Ohio. As a result of the Search Warrant, a quantity of narcotics and weapons were seized at Gary Susser's residence. Included in the weapons confiscated at Gary Susser's residence were the following firearms, as described and identified by the Affiant.

"A. Remington Semi Auto Rifle, model # 03A3, serial # 345 2229.

"B. Enfield bolt action, model # 303, serial # F8328.

"C. Unknown brand double barrel shot gun, serial # 10035.

"4. On Tuesday, 7-12-88, while at the MCSO Property Room, in the.presence of the Affiant and Attorney Louis Hoffman, Gary Susser physically identified the weapons described in Paragraphs #1 and #3 as being his property:

"A. Springfield 03A3 Rifle; Remington 30-06, 1942, Serial #3452229, which is a reported stolen in a burglary by Dayton Police Department and was held as evidence.

"B. Enfield -IV Military British 303, 1941, serial # F8328.

"C. Shotgun, Jamessen & Son Belgian double barrel carved wood stock D'Amasscus, serial # 10035.

"The above 2 weapons (Items listed as B and C) were released to the custody of Gary Susser's father, one Leonard Susser.

"5. On Sunday, 11-20-88, Gary Susser reported a Breaking & Entering to his office/residence at 800 Cascade Dr., to the Mad River Twp., PD. 800 Cascade Dr., is located in Mad River Twp., Montgomery County, State of Ohio. As a result Of the Breaking & Entering on 11-19--88, Gary Susser filed a claim with Cincinnati Insurance Company, Claim # 196 0023807. Refer to Appendix 'A' for list of property Gary Susser reported stolen in the Breaking & entering to Mad River Twp., PD and Cincinnati Insurance Company.

"6. On Wednesday, 1-18-89, the Affiant interviewed one Troy Tremaine, a convicted burglar in the Montgomery County Jail. Troy Tremaine gave the Affiant a written statement admitting to his involvement in the Breaking & Entering at 800 Cascade Drive. Troy Tremaine also advised that one Jamie Leach, W/M, as well as two (2) unidentified W/M's were also involved. Tremaine further advised that he stayed in the vehicle while Jamie Leach broke out a window at which point Leach and the two (2) unidentified W/M's entered the dwelling and removed the following property:

"A. A complete computer set up.
"B. Jam Box (portable radio).
"C. Camera.
"D. Whiskey.
"E. Stereo Componet [sic] Set.
"F. Extra Monitor for Computer.

"Troy Tremaine advised that the above listed items were the only items removed from Gary Susser's office residence. Troy Tremaine stated that the above listed items were sold to a 'fence' for $200.

"7. A check of information obtained from the Dayton Power & Light Co., Residential Records, indicates that service at 4601 Merrick Dr., Harrison Twp., Montgomery County, Ohio and 800 Cascade Dr., Mad River Twp., Montgomery County, Ohio, are in the name of Gary Susser. According to management at Meadows of Catalpa, one Phyllis VanHouten, Gary E. Susser maintains the condominium fees for 4601 Merrick Drive. The latest Breaking & Entering offense reported by Gary Susser at the 800 Cascade Dr., location. The above would indicate that Gary Susser maintains physical control of both locations. A check of telephone service to 800 Cascade Dr., particular list of 252-4545, according to information as Gary Susser, Attorney; another number 252-8590 was given by Gary Susser to Jack Morgan of

Cincinnati Insurance Company, upon his investigation of the claim. According to the latest telephone directory, Gary Susser is listed as residing at 4601 Merrick Drive, public service 277-1478.

"8. The Affiant believes that since Gary Susser filed a like and similar claim with Grange Mutual Insurance Company in 1984 and since Gary Susser submitted approximately 40 items stolen in the breaking and entering, and the suspect in the offense admitted to taking only 6 items, the Affiant believes that Gary Susser submitted a fraudulent report to Grange Mutual Insurance Company and properties reported stolen are at 4601 Merrick Dr., Harrison Twp., Montgomery County, State of Ohio. The Affiant further believes that further delay of searching the above locations will result in the destruction or loss of said evidence."

Appendix A contained a list of items of office equipment which appellant alleged to be stolen in the November 1988 burglary.

The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him there is a fair probability that contraband or evidence of a crime will be found in a particular place. The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Illinois v. Gates* (1983), 462 U.S. 213.

The fact that weapons which the appellant had reported had been stolen from him in 1984 and for which Grange Mutual compensated the appellant turned up in a search of the appellant's residence in 1988, coupled with Troy Tremaine's statement that he was present at the November 1988 burglary of appellant's office/residence and that appellant's claim of lost property was grossly exaggerated, certainly gave the trial court a substantial basis for believing that probable cause existed for believing that appellant had made fraudulent representations to both Grange Mutual and the Cincinnati Insurance Company to obtain insurance benefits.

Pursuant to the search warrants, police officers searched the appellant's residence and his office. Appellant contends that Officer Brown's affidavit fails to provide sufficient facts upon which the magistrate could reasonably conclude that the incriminating evidence would be found at either location.

Since many of the items sought were items of office equipment, it could be fairly inferred that these items would be located at the appellant's office where he would make use of them. See generally, *United States v. Rambis* (7th Cir. 1982), 686 F. 2d 620. Common sense also suggests that the appellant might conceal some of the items reported as stolen to the insurance company at his residence.

Appellant contends the information given by Officer Brown was "stale" information in that the alleged misconduct occurred on November 20, 1988. The alleged misconduct was that appellant misrepresented the extent of his loss in the November 1988 burglary and the information given in January 1989 was certainly not "stale." The magistrate could fairly conclude that if Tremaine and his companions had not actually stolen the amount of property appellant had told the insurance company in his proof of claim, then the property probably was still at appellant's office or home. The appellant is not likely to dispose of property which retains some continuing usefulness to him. *State v. Young* (1988), 37 Ohio St. 3d 249.

Appellant contends his motion to suppress the evidence seized by virtue of the search warrants should have been granted by the trial court because the searches were for all practical purposes executed in the nighttime and the warrants were issued for daytime searches. The evidence indicates the two warrants were signed at 7:20 P.M. and 7:23 P.M. and the searches began at 7:52 P.M. and were concluded at 9:00 - 9:30 P.M.

Crim. R. 41 provides that the warrant shall be in the daytime unless the issuing court, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at night. The term "daytime" means the hours from 7:00 A.M. to 8:00 P.M. See Crim. R. 41(F).

"Service" is the exhibition or delivery of a writ, notice, injunction, etc., by an authorized person to a person who is thereby officially notified of some action or proceeding in which he is concerned, and is thereby warned of some action or step which he is commanded to take or to forbear. *U.S. v McMahon* (1896), 164 U.S. 81.

In *State v. Valenzuela* (N.H. 1987), 536 A. 2d 1252, Justice Souter writing for the New Hampshire Supreme Court wrote it is the entry of the police in the nighttime, not their mere presence, that is thought to call for particular

judicial authorization, and the [statute] is therefore satisfied when the execution of the warrant limited to a daytime search is begun during the daylight hours, even though the police presence may thereafter continue into or through the night for the purpose of completing the search already begun.

Searches which began during the daytime and continued into the night have been held not to violate the analogous Fed. R. Crim. P. 41. *U.S. v. Woodring*, 444 F. 2d 749 (9th Cir, 1971); *U.S. v. Joseph*, 278 F. 2d 504. (3rd Cir.), cert. den. 364 U.S. 823; *U.S. v. Burgard*, 551 F. 2d 190 (1977).

We believe the Ohio legislature meant to draw the bright line at the announcement or entry point as that is more consistent with the conventional meaning "service" of a legal writ or document. Assuming, arguendo, the legislature meant that service encompassed the entire "execution of the warrant," we believe an objectively reasonable police officer would believe he had authority to serve a daytime warrant at any time before 8:00 P.M. as permitted under the Rule. The exclusionary rule would serve no useful purpose in this instance. *See, U.S. v. Leon* (1984), 468 U.S. 897 and *State v. Wilmoth* (1986), 22 Ohio St. 3d 251.

During the search of the appellant's residence, officers recovered several items which were not named as items or property to be seized pursuant to the search warrant. The officers testified that these items were found in searching for those items named in the warrant, and were seized because the officers believed there was probable cause to believe they were items containing drug residue, to-wit: cocaine.

Deputy Robert Weaver a 17 year veteran testified he searched dresser drawers in appellant's bedroom and recovered items he believed were "narcotic type items," to-wit: a pipe, a vial containing white residue, a brass type funnel, and a brown bottle containing white residue. Weaver stated he believed the white residue to be a controlled substance.

Terry Williams, a Dayton police detective assigned to narcotics task force, assisted officers in the search. He stated he searched kitchen drawers and recovered 13 computer diskettes (floppy disks). In the same drawer, Williams discovered a cut drinking straw next to a glass bottle containing a white residue he believed to be cocaine residue. He explained that cocaine is often ingested by a cut straw.

He also recovered an aluminum nail with the same white residue.

Appellant contends the search could not be valid pursuant to a "plain view" search because the incriminating nature of the items seize by officers Weaver and Williams was neither inadvertent nor was the incriminating nature of the evidence "immediately apparent." Citing, *Coolidge v. New Hampshire* (1971), 403 U.S. 443.

In *Horton v. California* (1990), 1990 Lexis 2937, the United States Supreme Court held the Fourth Amendment does not prohibit the warrantless seizure of evidence in plain view even though the discovery of the evidence was not inadvertent. Also the "immediately apparent" requirement is satisfied as long as the officer is in a position legitimately to view the object and has probable cause to associate the property with criminal activity. *Arizona v. Hicks*, _____ U.S. _____, 107 S. Ct. 1149 (1987).

Both officers were legitimately searching when they discovered the narcotics paraphernalia. They testified they believed in light of their experience that the items contained residue of a controlled substance. The court properly denied the suppression motion which attacked the "plain view" search conducted in this case. *State v. McGettrick* (1988), 40 Ohio App. 3d 25.

Lastly, the trial court properly found that no evidence should be suppressed because of the conduct of Jack Morgan. Morgan as an agent for his insurance company had every right to require that the appellant answer questions concerning his insurance claim. There was no evidence that he was an agent of the State or that the appellant was coerced in any manner into making any statements to the insurance company. The third assignment is overruled.

In his fourth assignment, appellant contends the trial court erred when it failed to dismiss the fourth and sixth counts of the indictment upon timely motions of the appellant. Essentially the appellant contends in this assignment that the State failed to provide the appellant's expert chemist access to certain equipment possessed by the Miami Valley Regional Crime Laboratory so the expert could conduct a chemical analysis of the suspected cocaine fourteen days before trial and therefore such failure mandates the dismissal of these drug charges.

On April 25, 1989, the appellant moved for an order pursuant to R.C. 2925.51(E) for the State to provide a sample of the alleged controlled substances seized by the police for the purpose of it being tested. On May 23, 1989, the trial court granted the appellant's motion. On May 30, 1989, the appellant moved to dismiss counts 4 and 6 for the State's failure to comply with R.C. 2925.51(E) in that appellant alleged that "there was an insufficient amount [of the drug] present to do an appropriate chemical analysis."

It is appropriate to note that Larry Dehus, the forensic chemist hired by the appellant, informed appellant's counsel on May 22, 1989 that preliminary screening tests for cocaine were positive on the trace residues on two glass vials, one brass funnel, and a straw found by police at appellant's residence. (see Docket and Journal Entries).

At a motion to suppress hearing conducted prior to trial on June 27, 1989, the trial court made the following observation:

"THE COURT. I made it clear to counsel, both prosecutor and the defense counsel, that the --you could have an expert, this one or any other one, go to the Miami Valley Regional Crime Lab and, using their equipment, conduct the type of examination that I have been led to believe would allow for the identification of those substances. Did I not?

"MR. BRANNON. You indicated that I should attempt to do that, yes, sir.

"THE COURT. I don't think I said you should attempt to do that. I think I indicated that would be made available to you, it would be your choice.

"MR. BRANNON. I think there were some objections about that.

"THE COURT. No, the only statement was, and correct me if I'm wrong, from the State, is that it was possible in doing that, there then would be nothing left, but the State doesn't object to that, in fact, that I made it clear and if I haven't said it on the record, I'll say it now. The statute allows you the right to have an independent analysis. That's been granted.

"You have told me that-your expert, Mr. Dehus, said that he doesn't have the equipment to be able to perform that. That, however, that equipment exists at the Miami Valley Crime Lab. I've indicated to you, after discussing it with the prosecutor, that your expert would be permitted to go to that laboratory, use their equipment and conduct that analysis.

The only problem, however, is that it's believed that that would then result in the dissipation of any remaining substance.

"I indicated to you that, in my opinion, you could preserve your right to have the separate analysis, the independent analysis and the fact that that resulted in no substance being left would not mean that the case could continue to be prosecuted. That there does not have to be a substance left, that in fact reports, if accepted by the Court, both from the prosecutor and anything you offered from the defense, could be the basis for which a finding could be made. So, upon the first point, unless you need to offer testimony further, the Court, has, I believe, provided the solution to that particular dilemma.

"Let me ask the witness while he's here. Would there be any problem that I have not anticipated with your ability to go to the Miami Valley Crime Lab and use their equipment, for instance, you know how to use it, correct?

"THE WITNESS. Yes, that's correct. That's not a problem.

"THE COURT. The equipment we would be referring to that you believe necessary was?

"THE WITNESS. A G.C. mass spec.

"THE COURT. Mass spec, correct. You are certainly skilled in operating that?

"THE WITNESS. Correct.

"THE COURT. So is there any reason why you couldn't go there and use that equipment?

"THE WITNESS. There's no reason on my part. However, they in the past have taken the position that they will not allow independent expert witnesses to come in and utilize their equipment.

"THE COURT. That's not your problem. That's solved. I'm asking you is there any problem on your part.

"THE WITNESS. Absolutely not.

"THE COURT. That takes care of number one, Mr. Brannon; if you wish to exercise your right to have the independent analysis, the road has been cleared for you. The choice is totally yours. If you choose not to exercise it, then it's by your choice and not by any impediment or any roadblock which prevents you from doing that."

On June 30, 1989, counsel met in the court's chambers for a scheduling conference. The trial had been set for July 10, 1989, and the court wished to determine if any possibility of a plea bargain remained. When no plea bargain could be achieved, the court asked appellant's counsel the following:

"THE COURT. Was your expert able to, or will he be able to, between now and the time of trial, make use of the Miami Valley Crime Laboratory facilities?

"MR. BRANNON. The facilities are there to be done, if we choose to do it. That's a tactical call, just like you said; we are still discussing it. It will have to probably be done by Wednesday if we are going to do that. We are making a tactical call as to whether or not to show what's there and say we didn't take any more of it.

"THE COURT. If you will please advise them over there, so that you don't run into a last minute --- the machine is down and it can't be done between then and trial. If you will confirm that it can be done, if you choose to have it done, I would appreciate that.

"Anything else that you -- any other loose ends from the State's end? Did we miss any motions?

"MS. EVANS. No, in going through, drafting the entry, I think we have covered all the motions and at this point in time, everything is basically taken care of."

It is clear that counsel *ten* days before trial was indecisive as to whether the appellant wished to take advantage of the Crime Laboratory's instruments to analyze the suspected cocaine. Appellant can hardly now claim he was prejudiced by the State's failure to meet the 14 day trial requirement of R.C. 2925.51(E). The appellant was given the opportunity to have his expert verify the alleged presence of cocaine on the items found in appellant's residence. The fourth assignment is overruled.

Appellant contends in his fifth assignment of error that the amount of the alleged cocaine was such that it did not constitute a violation of R.C. 2925.11(A). The State's evidence was that trace amounts of cocaine were found on the drug paraphernalia. Michael Walthen testified the amount of cocaine on the paraphernalia was less than .01 grams and thus had to be characterized as "residue." He testified he took a scraping from inside each of the suspect items and while he did not weigh them, he would estimate the amount to be "probably a microgram", or a thousandths of a gram (.001 g). (Tr. 558, 559). He compared the amount to two or three granules of table salt. (Tr. 589).

In *State v. Dempsey* (1970), 22 Ohio St. 2d 219, the Ohio Supreme Court held that where the only evidence against one accused of possession of marijuana shows that a few minute particles of marijuana were found among the lint and debris of his jacket pocket, the presumption of scienter granted in favor of the State by R.C. 3719.09 does not apply. Justice Schneider noted in the opinion:

"While the presumption of intent, contained in R.C. 3719.09 may be lawfully applied under some circumstances, such a presumption is unreasonable unless a rational connection exists between the proven fact (possession) and the presumed facts (knowledgeable possession of a narcotic). Otherwise, the defendant is denied due process of law. *Leary v. United States* (1969), 395 U.S. 6, 33--37; *Tot v. United States* (1943), 319 U.S. 463, 466-467. See, also, *State ex rel. Herbert v. Whims* (1941), 68 Ohio App. 39, 46; *State v. Smith* (Muni. Ct. 1964), 8 Ohio Misc. 148, 150; *State v. Schultz* (Muni. Ct. 1964), 1 Ohio Misc. 81. Under this standard, statutes which presume scienter from the proven fact of physical possession of a narcotic have been held valid under circumstances in which the necessary rational connection is apparent. See *Yee Hem v. United States* (1925), 268 U.S. 178.

"The only narcotic drug found in this case was a few minute particles which were mixed among the lint and debris of a jacket pocket. The proven fact of physical possession, in this instance, does not have a sufficient rational connection to the presumed fact that Dempsey *knew* that he possessed the particles to permit the use of a presumption as a substitute for proof of knowledgeable possession of a narcotic beyond a reasonable doubt.

"Common experience does not tend to indicate that one knows what is in the linty debris of his pockets. It is just as likely, if not more so, that one has no idea what is hidden there."

In *State v. Brehm* (1971), 27 Ohio St. 3d 239, the Ohio Supreme Court in a per curiam opinion held that flakes of marijuana present between the sheets of cigarette papers was an insufficient amount of marijuana to warrant a finding of guilty knowledge as to the presence of marijuana as a matter of law.

In *State v. Walter Wright* (Oct. 9, 1985), Hamilton App. C-840864 unreported, the Court of Appeals held that .43 milligram of cocaine was a sufficient amount of the controlled substance to support the appellant's conviction for a violation of R.C. 2925.11(A). The court of appeals stated it was unwilling to state as a matter of law that any given minimum amount of a particular controlled substance must be present to establish guilty possession of the substance.

The court in *Wright* noted that when the appellant was apprehended he was surrounded by items commonly utilized by drug paraphernalia and he was pouring the contents of a box of baking soda down the kitchen sink and a vial with a small amount of cocaine inside was found in the box. The court held the jury properly inferred that the appellant knowingly possessed the cocaine in light of the totality of the circumstances. The court did note that "the record of the proceedings of this case contains neither affirmative allegations nor proof that the amount of cocaine in the glass was merely an unusable residue." See also, *State v. Daniels* (1985), 26 Ohio App. 3d 101.

In *People v. Leal* (1966), 64 Cal. 2d 504, 413 P. 2d 665, the California Supreme Court concluded that the California Legislature meant in penalizing a person who possesses a narcotic to proscribe possession of a substance that has a narcotic potential. It did not refer to useless traces or residue of such substance. Hence the court found that the possession of a minute crystalline residue of narcotic useless for either sale or consumption does not contain sufficient evidence in itself to sustain a conviction. Justice Tobriner sketched the development of the cases which interpret the drug possession statute in order to delineate, if possible, the test which the courts have evolved to define the proscribed possession. The Justice noted at page 668 of the court's opinion:

"The most probing of the cases in this line is *People v. Aguilar* (1963) 223 Cal.App. 2d 119, 35 Cal.Rptr. 516. There the police found in the defendant's possession a narcotics injection outfit which included two spoons bearing deposits of heroin. In reversing the conviction, the court placed primary emphasis upon the fact that the heroin on the spoons appeared in the form of crystalline encru̇stations, rather than in its normal powdery form. The court distinguished prior cases in which the narcotic, although small in quantity, retained its customary appearance. It also made note of the fact that in *Marich*, 'the residue in the bindle and cotton *** could be used by a person wishing to inject the remains found to be present.' (P. 121, 35 Cal. Rptr. p. 518.) The

court concluded: 'Here, we may infer *** that heroin in powder form had first been liquefied and the resultant emulsion drawn from the spoons by means of the hypodermic needles and used for injection purposes. What remained in the bottom of the spoons was residue which was in a completely different form from that of heroin powder. The crystalline incrustations on the spoons could remain in that state indefinitely ***. Any nonscientifically trained person, albeit an addict, observing the spoons *** would have been unable to detect the presence of heroin since neither powder nor liquid remained. It is not scientific measurement and detection which is the ultimate test of the known possession of a narcotic, but rather the awareness of the defendant of the presence of the narcotic. *Guilt or innocence on a charge of illegal possession may not be determined solely by the skill of the forensic chemist in isolating a trace of the prohibited narcotic in articles possessed by the defendant.* As forensic science, measuring devices and techniques improve, smaller and smaller amounts of residue are required for the chemist to detect the presence of the narcotic. The presence of the narcotic must be reflected in such form as reasonably imputes knowledge to the defendant.'" (Pp. 122--123, 35 Cal. Rptr. p. 519.)

Justice Tobriner also noted that the Court could not overlook the fact in determining legislative intent that the possession of minute traces of narcotics residue poses less danger of future harm and is less probative of an intent to use narcotics in the future, than the possession of narcotics implements which the legislature denominated a misdemeanor.

The *Leal* decision appears to have continuing vitality in California. *See, People v. Carasco* (1981), 118 Cal. App. 3d 936, 173 Cal. Rptr. 688; see also *Beutler v. State* (1972), 88 Nev. 707, 504 P. 2d 699. The court in *Leal* was not prepared to say that the discovery of traces of narcotics in defendant's possession was without legal significance. The presence of such traces would, for example, often be necessary to establish that otherwise innocent appearing implements comprise a narcotics injection outfit. *See* fn. at 668.

Presently in Ohio, possession of a Schedule II drug is a fourth degree felony and possession of drug abuse instruments is a misdemeanor of the second degree.

We agree with the appellant that his conviction for drug abuse cannot stand as a matter of law where he allegedly has "knowingly" possessed such a minute quantity of cocaine, to-wit, .001 grams that its very presence must be confirmed by extraordinary microscopic analysis. We also believe this decision is consistent with the intent of the legislative scheme in proscribing narcotics possession and distribution.

Our resolution of appellant's assignment as it relates to Count IV however does not require a similar result as to Count VI, "the possession of criminal tools charge."

The police officers testified they found the narcotics paraphernalia with trace amounts of cocaine in the appellant's bedroom dresser drawer and kitchen drawer. The jury could have reasonably found that the appellant knowingly possessed the drug paraphernalia from all the circumstances. *Jackson v. Virginia* (1979), 443 U.S. 307. In a supplemental brief filed recently, the appellant contends he could only be convicted of possession of a drug abuse instrument under R.C. 2925.12. As authority for that argument he cites *State v. Chandler* (1989), 54 Ohio App. 3d 92 wherein the Cuyahoga County Court of Appeals held that R.C. 2923.24 cannot be used to convict a person of possessing and controlling a syringe. R.C. 2925.12 refers only to hypodermic needles or syringes as the drug instrument encompassed in the relevant statute. R.C. 2925.14 was newly enacted to cover other implements or instruments to ingest controlled substances. This statute was not effective however until November 2, 1989. There was insufficient evidence to sustain the appellant's conviction upon Count IV. There was sufficient evidence to support appellant's conviction upon Count VI. The appellant's fifth assignment is sustained in part.

In his sixth assignment, appellant contends the trial court erred in permitting the State to go forward with the prosecution of Counts IV and VI when the State had a clear legal duty to elect one or the other. The State was not required to make such an election. *State v. Osborne* (1976), 49 Ohio St. 2d 135. Appellant contends in an unrelated argument to the assignment that the indictment was defective in that Count Six fails to specify the "criminal tool" appellant allegedly possessed. The indictment adequately states an offense. See, *State v. Headley* (1983), 6 Ohio St. 3d 475. The criminal tools were specified in the bill of particulars provided by the State. The appel-

lant had adequate notice. See generally, *Barberton v. O'Connor* (1985), 17 Ohio St. 3d 218. The sixth assignment is overruled.

In his seventh assignment, appellant contends the trial court erred when it failed to grant his motion for an acquittal at the conclusion of the State's case and at the conclusion of all the evidence because the State failed to prove the element of "possession" of the cocaine and the criminal tools. Appellant contends R.C. 2925.01(2) is dispositive of this assignment. That section provides:

"'Possess' or 'Possession' means having control over a thing or substance *but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found.*" (Emphasis ours).

The State did not attempt to prove that appellant possessed either the cocaine or the drug paraphernalia because appellant "owned" the condominium in which the drugs were found or because appellant "occupied" the premises on Merrick Drive. The State presented evidence that the drug paraphernalia was found in a dresser drawer located next to the appellant's bed. Other personal effects of the appellants were found in the dresser drawer. That the defendant exercised dominion or control over the drugs may be indirectly proven through circumstantial evidence when the drugs are found. *United States v. Craven* (6th Cir. 1973), 478 F. 2d 1329. As stated in our treatment of the appellant's fifth assignment, the trial court erred in not granting the appellant's motion for a judgment of acquittal on the drug abuse charge. In all other respects, the seventh assignment is overruled.

In his eighth assignment appellant contends the trial court erred "in failing to rule that the State misused the tape and alleged transcript of appellant and in failing to order the tape itself introduced as the best evidence if not the only probative evidence of the appellant's statement."

Jack Morgan, agent for Cincinnati Insurance Company testified he interviewed the appellant at appellant's office on December 20, 1988 in regard to the insurance claim made by appellant. Morgan tape recorded the conversation with appellant's permission. The interview lasted one and one-half hours. A Cincinnati Insurance employee prepared a transcript of the tape recording which Morgan testified accurately reflected his interview with the appellant. (Tr. 279). Morgan testified he reviewed the transcript of the tape which was some eighty-two pages long. Appellant's counsel did not object to Morgan's use of the transcript to refresh his memory in giving his testimony. Counsel did not offer into evidence the tape to impeach the testimony of Mr. Morgan.

During the direct examination of the appellant, his counsel offered into evidence a copy of the tape of appellant's interview with Morgan. (Defendant's Ex. BBB). Counsel sought to introduce a copy of the tape to demonstrate inaccuracies he contended existed in Morgan's recollection of his interview with the appellant. The court stated the tape could be introduced if appellant could be specific about the discrepancies. Appellant contended Morgan was inaccurate in certain specific areas, to wit: "the computer, our personal relationship, his knowledge of me; that's all I can pull from memory." (Tr. 899).

During the cross-examination of the appellant, counsel for the State attempted to question appellant from the transcript of the tape. Counsel for the appellant objected as to the accuracy of the transcript, and the court then stated:

"THE COURT. You raised two different points. One is whether or not that's an accurate recitation of what was said. Two is its interpretations. The second part, obviously, is open to argument between counsel. As to its accuracy, I've been shown nothing to indicate why it is not accurate. *You have your tape and record in the record. and I am satisfied that is an accurate typing of that transcript and the record will have a tape in it that if someone wants to review it further to show that that is not. that was not said. then it will be on the record.* So I'll overrule the objection."

(Thereupon, the Court was in recess.)

The transcript (State's Exhibit 2F) was not admitted because the court found that the transcript was confusing, i.e. the words and phrases all ran together). The tape (Def. Exhibit BBB) was not admitted, although the basis for the court's ruling was not clear in the record.

The appellant contends that the tape should have been admitted because it was the best evidence of the conversation between Morgan and the appellant. Had the court admitted the transcript of the interview without admitting the tape recording we would

agree with the appellant. See, *State v. Holmes* (1987), 36 Ohio App. 3d 44. Appellant failed to demonstrate in the record or in his brief what critical evidence was contained on the tape (Def. Exhibit BBB) which would have contradicted Morgan's testimony or assisted the appellant in the defense of his case. The appellant failed to demonstrate prejudice as a result of the court's ruling.

In a totally unrelated argument, appellant contends the trial court erred in denying him the right to bring out in cross-examination of Theresa Servaites, his probation officer, that his drug screenings were negative for the presence of cocaine on December 19, 1988 and from mid-February through April of 1989. Appellant was found in possession of the drug paraphernalia and cocaine residue on January 23, 1989. The trial court did not abuse his discretion in determining that such evidence was not relevant or probative as to whether the appellant possessed the cocaine on January 23, 1989. The eighth assignment of error is overruled.

Appellant asserts in his ninth assignment the trial court erred by not dismissing on or both counts of falsification and/or attempted theft as they were of similar import. R.C. 2941.25 provides that where the same conduct by the defendant can be construed to constitute two or more allied offenses of similar import, the indictment may contain counts for such offenses, but the defendant may be *convicted* of only one.

Although the jury found the appellant guilty of both the falsification charge and the attempted theft charge in regard to the Cincinnati Insurance Company claim, the court entered a conviction *only* as to the falsification charge. The appellant's contention of error is without merit.

Appellant contends the trial court should have dismissed Counts II and Count III because they failed to allege a specific date when the alleged falsification and/or attempted theft occurred. The indictment alleged the offenses occurred between November 19, 1988 and April 6, 1989. Under Crim. R. 7(D)1 an indictment charging the offense of rape is not rendered invalid for failing to state the time at which the offense was committed, where the exact date and time of the offense are not material elements of the crime nor essential to a validity of the conviction. *State v. Madden* (1984), 15 Ohio App. 3d 130.

In a bill of particulars, the State contended the appellant submitted a particular false claim, to wit a claim for $28,000 in property which he claims was stolen in a breaking and entering of his office/residence on November 20, 1988.

Appellant contends the indictment was defective because it failed to set forth with specificity the alleged items of the attempted theft or contents of the falsification within the requirements of Crim. R. 7(B). That rule merely requires the indictment to be couched in language of the applicable section of the statute as long as the words of that statute charge an offense. The indictment in this case met that requirement.

Appellant contends the trial court erred when he failed to dismiss the falsification and attempted theft charge because the State failed to introduce the Cincinnati Insurance Company policy. There is no merit to this argument. There was no dispute that appellant sought to recover for losses under a policy of insurance with the Cincinnati Insurance Company. The policy did not have admitted into evidence to prove the charges. This ninth assignment is also overruled.

In his tenth assignment, appellant contends the trial court erred in permitting Agent Morgan to testify concerning conversations he had with Troy Tremaine and in admitting Tremaine's statement to Detective Brown. Any prejudice in the admission of this evidence was dissipated when Tremaine took the witness stand and answered questions concerning his statement. The tenth assignment is overruled.

In his eleventh assignment of error, the appellant contends the trial court erred in not granting his motion for a judgment of acquittal of Counts II and VI which was made at the conclusion of all the evidence. Pursuant to Crim. R. 29(A), a court may not order a judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of the crime was proved beyond a reasonable doubt. *State v. Bridgeman* (1978), 55 Ohio St. 2d 261; in other words, it is only where reasonable minds could not fail to find reasonable doubt that a motion for judgment of acquittal should be granted. *State v. Brown* (1982), 7 Ohio App. 3d 113.

It is uncontroverted that the appellant's office was burglarized on or about November 19, 1988. It is also uncontroverted that the

appellant reported to Agent Jack Morgan of the Cincinnati Insurance Company on December 19, 1988 that he suspected his client Troy Tremaine or his friends had committed the crime.

The appellant submitted a detailed proof of loss form to the Cincinnati Insurance Company on December 19, 1988. In a handwritten statement given to Detective Brown on January 18, 1989, Troy Tremaine stated he was present when "James Leach and two other guys I didn't know" broke into the appellant's office and stole "the whole computer set up, jam box, camera, whiskey, stereo components, extra monitor to computer." (See State's Exhibit 10).

The State's case against the appellant relative to the falsification and attempted theft charges revolved around the recovery of five items of property in the January 23, 1989 searches; to wit: the police recovered a 12" Homelite chainsaw, a Sharp calculator, a G.E. portable radio, a RCA Camcorder and computer diskettes.

In the proof of loss, appellant contended his 20" Homelite chain saw had been stolen in the burglary. Loren Ferguson a client of the appellants who performed odd jobs around appellant's office corroborated appellant's testimony that he owned a 20" Homelite saw at the time of the burglary. Ferguson stated the 14" saw recovered by the police looked just like the saw of Ralph Marsh upon which he had installed a starter rope. Ralph Marsh testified he was asked to stay at the appellant's office after the burglary. He stated the office was located in a large old mansion with six bedrooms and fireplaces in each of them. He said he paid a small rent payment and part of the utilities. He said the 12" Homelite saw confiscated in the search was his, which he used to cut wood for the bedroom fireplace. He also identified the GE portable radio as his radio.

Michael Marsh corroborated his brother's testimony. He testified that he was a friend of the appellants and appellant let him come live at the mansion when he broke up with his wife in December, 1988. He said he was present when the police searched the office-mansion and took his brother's saw and radio. The radio Marsh said had been given to his brother by his mother. (Tr. 702). In the proof of claim, appellant stated the burglars had taken a clock radio/secretary (no brand name known) and he provided a cancelled check for its purchase from Best products in 1987 for $52.98.

Appellant contended in his proof of loss that he had lost two Sharp calculators in the burglary. The police recovered one Sharp calculator at appellant's office during the January 1989 search (State's Exhibit 27). Appellant testified he bought the calculator after the burglary to replace one of the stolen ones and he produced a receipt for its purchase (Def. Exhibit WW) on November 28, 1988.

In his proof of loss forms, appellant contended the burglars had taken software disks which had recently been created by a computer programmer and consulter, John Mocabee. Mocabee testified he operated a management consulting firm in Centerville, Ohio and did computer consulting for IBM mainframe computers and personal computer systems. He stated he had performed consultant work for such firms as Mead, Ernst and Whinney, G.E., and Dayco Corporation.

Mocabee stated he was requested by appellant to update his computer operating system for appellant's law practice. He said appellants knowledge of computers was extremely limited. He stated he converted appellant's computer system in August 1988 and the computer diskettes that were then in existence were obsolete. After the burglary, Mocabee stated appellant asked him to give him an estimate of the cost of restoring the computer software system which Mocabee had installed in August 1988. He stated it would cost $7979.62 to do so and he submitted an itemized invoice. (Defense Exhibit 00). Mocabee stated this was not for any hardware, but for purchasing software, installing it, and loading all of the data from the permanent files that they could reconstruct because that was all on the internal hard disk in the computer.

Mocabee stated he had converted appellant's computer to Lotus from Super Calc. He was shown State's Exhibit 22 which were the computer diskettes recovered in the search of appellant's residence. He stated these were the obsolete diskettes that existed prior to the time Mocabee had created a new operating system for appellant's office files. He said they appeared to be back-up tapes diskettes, "from what the system was before the conversion."

The State was unable to refute any of the appellant's explanations for the items of property recovered in the January 1989 searches. The only damaging evidence presented by the

State in relation to Counts II and VII was the discovery of the RCA Camcorder in the appellant's residence during the police search.

Dale Shade, an electrical contractor, testified he was a former client of appellants who became a close social friend as well. Shade testified he performed electrical work at appellant's office as well as his residence. He testified he did some electrical work for a Halloween party at appellant's office just before the burglary. He said he still had some unfinished work to do at appellant's residence and appellant had given him keys to both locations. He testified that shortly after Halloween he borrowed appellant's Camcorder from appellant's office to record some lighting work in Cincinnati. He said appellant was not in his office when he borrowed the Camcorder but appellant had on a prior occasion said he was free to borrow the Camcorder anytime he wished. He said he didn't remember telling appellant he had borrowed the camcorder, but he returned it to appellant's condominium residence on Merrick when he was doing some work there in mid-January 1989. He said he placed the camera under appellant's dining room table when appellant was not home. Shade identified State's Exhibit 12 the Camcorder found in the police search as the Camcorder he borrowed from appellant's mansion in November 1988. Ann Shade corroborated her husband's testimony and said she was present when he returned appellant's Camcorder to his residence around January 15, 1989.

The appellant testified he was unaware Shade had borrowed his Camcorder and thus concluded the burglars had stolen it. He said he did not see it until the day he left for the Super Bowl in the third week of January 1989. He said he planned to tell the insurance company to delete the Camcorder from the proof of loss claim form but the police confiscated it in the search of January 23, 1989. The State was unable to refute this testimony or impeach the Shades' testimony in any manner.

A Rule 29 motion challenges the prosecution's prima facie case and its purpose is to test the legal sufficiency of the evidence. *Dayton v. Rogers* (1979), 60 Ohio St. 2d 162. The grounds for granting such a judgment are strongest when there is a failure to prove an element essential to the offense. The motion is also properly granted if the trial court determines that the evidence adduced in support of the state's case fails to attain "that high degree of probative force and certainly which the law demands to support a conviction." *State v. Goodin* (1978), 56 Ohio St. 2d 438, 442. See also, *State v. Kline* (1983), 11 Ohio App. 3d 208.

After viewing the evidence in a light most favorable to the prosecution, we cannot find that a rational trier of fact could have found the essential elements of falsification and attempted theft beyond a reasonable doubt. *Jackson v. Virginia* (1979), 444 U.S. 890. A rational jury could have found the appellant guilty of possessing criminal tools, to wit: the drug paraphernalia. The eleventh assignment of error is sustained in part.

In his twelfth assignment of error, appellant contends the prosecution committed prejudicial error against him by their conduct at trial; to wit improper argument, failure to provide timely discovery and to provide helpful evidence to the appellant. We have reviewed the record and find no basis for this assignment.

. In his thirteenth assignment, appellant contends the trial court was committed judicial misconduct which denied him a fair trial. Appellant contends the trial judge was hostile toward the State's counsel, his counsel, and him. He contends numerous sidebar conferences were conducted but some were recorded, others were not. He also contends the court's failure to make written rulings upon his motions prejudiced his right to a fair trial. We have examined the entire record and we find that the appellant was accorded a fair trial. The last assignment is overruled.

The judgment of the trial court wherein the appellant was convicted and sentenced for the crimes of falsification, attempted theft, and drug abuse will be Reversed. The judgment of the trial court finding the appellant guilty of the possession of criminal tools will be Affirmed. This matter will be Remanded to the trial court for further proceedings consistent with this opinion.

FAIN, J., and GRADY, J., concur.