OPINION
Appellant, Anton D. Hamilton, Jr., appeals from the judgment entered by the Lake County Court of Common Pleas. A jury found appellant guilty of murder with a firearm specification. The court sentenced appellant to fifteen years to life for the murder charge and an additional three years for the firearm specification.
On May 11, 1999, family and friends became concerned about the whereabouts of the victim, Melvin Hamilton, after he did not show up at various events that day, including work. Later that evening, his body was found by his family and friends in the bedroom of his Painesville residence. Melvin Hamilton had been shot three times with his own .38 caliber revolver. The gun was placed under his right hand, apparently in an attempt to make the crime look like a suicide. The victim was appellant's grandfather.
Medical evidence established that the victim died in the late evening hours of May 10, 1999, or in the early morning hours of May 11, 1999. As police investigated the crime scene, the family and friends of the victim began to gather in the downstairs portion of the victim's house. Anton D. Hamilton, Sr. (appellant's father and the victim's son) went over to Linda Brandon's (appellant's mother) house to find appellant. Mr. Hamilton, Sr. questioned appellant about what had happened to the victim, as the two of them walked back to the victim's house.
Family and friends began to suspect that appellant had murdered the victim. Appellant had been staying with the victim the previous weekend. The victim told appellant he had to be out of the house by May 10, 1999. The night the body was discovered, appellant sat on the couch in a "nonchalant" manner with his arms crossed.
Sgt. Lutha, of the Painesville Police Department, responded to the scene. After being at the scene a short time, he was told by his chief to question appellant, because appellant was believed to be one of the last people to see the victim alive. Sgt. Lutha took appellant down to the police station to question him as a witness. After taking one statement, Sgt. Lutha received a phone call from the scene, where other witnesses were being questioned, and found that there were inconsistencies between appellant's version of the events of May 10, 1999, and those given by witnesses at the scene. He then read appellant his Miranda rights. See Miranda v. Arizona (1966), 384 U.S. 436. Appellant then gave a second statement that was consistent with his first. In both statements appellant denied having anything to do with the victim's death. Appellant's fingerprints were taken, and a gunshot residue test was performed on his hands.
On May 18, 1999, appellant's fingerprints were found to match a latent fingerprint on the murder weapon. An arrest warrant was issued for appellant for murder. Sgt. Lutha called Mr. Hamilton, Sr. and had him bring appellant back to the police station. Appellant was given his previous statement to look over and, after reviewing it, did not want to add or change anything. He was then Mirandized again. Sgt. Lutha informed him that his fingerprints were found on the gun, to which appellant responded after a period of silence, "you might as well take me over." Appellant was arrested and taken to jail.
Appellant raises eight assignments of error. These assignments of error will be addressed out of order. Appellant's first assignment of error is:
 "The trial court erred by denying the appellant's motion to suppress statements purportedly made by appellant to police officers."
 Appellant moved to suppress the various statements he gave to the police. A suppression hearing was held, and the court overruled the motion to suppress. There are four individual statements that appellant gave to the police.
Appellant's first statement was given to police at 11:38 p.m., on May 11, 1999, the night the body was found. Sgt. Lutha testified that he was questioning appellant as a witness. Sgt. Lutha stated that the reason he did not take appellant's statement at the scene was that there were a lot of people there, including other witnesses giving statements. Sgt. Lutha further stated that he usually takes statements at the police station so he can use his computer.
In this statement, appellant states that the last time he saw the victim was about 8:30 p.m., on May 10, 1999, at the victim's house. He stated he left his cousin's apartment and went to the victim's house to get his bag. He said he was only at the victim's house for about five minutes, and he could not remember if the victim was wearing pajamas or regular clothes. He then stated he went to a friend's apartment for about ten minutes and then returned to his cousin's apartment.
A Miranda rights warning is only required when a custodial interrogation takes place. State v. Mason (1998), 82 Ohio St.3d 144, at 153, citing Berkemer v. McCarty (1984), 468 U.S. 420. "The fact that a suspect is being interviewed at a police station does not, per se, require a Miranda rights warning." Id. at 154. There was no question this first interview was an interrogation. The question was whether it was custodial, and the Supreme Court of Ohio has stated the following in regards to this question:
 "[T]he determination as to whether a custodial interrogation has occurred requires an inquiry into `how a reasonable man in the suspect's position would have understood his situation.' * * * `The ultimate inquiry is whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" (Citations omitted.) Id.
 The following testimony by Sgt. Lutha demonstrated that appellant voluntarily went with Sgt. Lutha to the police station. He rode in the front seat of an unmarked police car. He was not handcuffed. At the station, he was questioned in an office with the door open. He was not Mirandized before this questioning, because he was considered a witness, not a suspect, at this time. Appellant was not placed under arrest at any time during this interview. Nor was his freedom restrained in a manner consistent with formal arrest. This was not a custodial interrogation, so appellant did not need to be informed of his Miranda rights.
After appellant's statement was given, Sgt. Lutha received a call from the scene. An officer there told him that Ms. Lawrence, the victim's fiancée, had stated she saw the victim at 8:30 p.m. on May 10, 1999, at her house. Based, in part, on this discrepancy, Sgt. Lutha stated he began to consider appellant a suspect at this time.
Sgt. Lutha further testified that, while still at the police station, appellant was read his Miranda rights. He also signed a waiver of his rights in the beginning of his second statement. "`[A]fter a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.'" State v. Murphy (2001), 91 Ohio St.3d 516, 520, quotingDavis v. United States (1994), 512 U.S. 452, 461. He then reviewed his first statement and gave a second statement.
His second statement was consistent with the first. He reiterated that he last saw the victim the night before, that he did not hurt the victim, and that he did not know what happened to the victim. After the statement, appellant's fingerprints were taken, and a gunshot residue test was performed on his hands. Appellant was then asked where he wanted to go, and he was driven to a nearby apartment complex.
Based on the preceding evidence, the state was able to demonstrate that appellant voluntarily waived his Miranda rights. There is no basis to suppress his second statement.
On May 18th, after learning that appellant's fingerprint was found on the gun, Sgt. Lutha obtained an arrest warrant for appellant. He then called Mr. Hamilton, Sr. and asked him to bring appellant down to the police station. Appellant was given his second statement from the initial interview, and was asked if it was correct. This statement contained theMiranda warnings in the first paragraph. Appellant stated that the statement was correct. Appellant was then Mirandized, and he signed aMiranda waiver card.
Appellant should have been read his Miranda rights at the onset of the meeting. This was a custodial interrogation, because Sgt. Lutha testified that appellant was not free to leave, and appellant was arrested shortly after the statement. However, the Miranda warnings were in the previous statement that appellant re-read. Appellant signed a Miranda rights card immediately after he acknowledged the statement was true, but before he was further questioned. Taken together, these exposures cured any violation of his Miranda rights, because appellant was certainly made aware of his rights.
Sgt. Lutha also testified that after he was Mirandized, appellant was told his fingerprint was found on the gun. After he was told this, appellant remained silent for a few moments, then responded "you might as well take me over." This statement occurred after appellant had voluntarily waived his rights under Miranda. Appellant was then arrested and taken to jail. Since there was a valid waiver of appellant'sMiranda rights, the trial court did not err by not suppressing this statement.
Finally, Sgt. Lutha testified at the suppression hearing that appellant was questioned while he was in jail on May 19, 1999. Appellant was not given Miranda warnings before this questioning. There is no question that appellant was in custody, as he had been arrested and was in jail. Appellant should have been read his Miranda rights before being questioned in jail. These statements should have been suppressed. However, neither this brief interview, nor the statements given therein, was mentioned in front of the jury at trial. Therefore, appellant was not prejudiced. Since there was no prejudice, there was no error.
Appellant also challenges the court's decision not to suppress the final two statements on Sixth Amendment grounds. Appellant claims that he should not have been questioned without an attorney present per Massiahv. United States (1964), 377 U.S. 201. The Sixth Amendment right to counsel attaches once adversarial judicial proceedings have commenced against the accused. Kirby v. Illinois (1971), 406 U.S. 682, 688. TheKirby court went on to state that the initiation of adversarial judicial proceedings includes "formal charge, preliminary hearing, indictment, information, or arraignment." Id. at 689.
Appellant claims the adversarial judicial proceedings began when the warrant was issued for his arrest. However, "since the Kirby court found no right-to-counsel violation when the defendant was actually under arrest, the mere issuance of an unexecuted arrest warrant could not invoke the right to counsel." State v. Holmes (1987), 36 Ohio App.3d 44,49, citing United States v. Reynolds (C.A.6, 1985), 762 F.2d 489, 493. Thus, appellant's Sixth Amendment right to counsel had not attached when he gave his third statement to police.
Both state and federal courts have rejected the notion that the Sixth Amendment right to counsel attaches on the issuance of an arrest warrant. See Holmes and Reynolds. There were no hearings held involving appellant between the time he gave his third statement and the time he gave his fourth statement the following day. Therefore, as there had not yet been any adversarial judicial proceedings, appellant's Sixth Amendment right to counsel did not attach prior to his fourth statement.
Appellant's first assignment of error is without merit.
Appellant's fourth assignment of error is also related to the statements given to the police by appellant:
 "The trial court abused its discretion by allowing the withdrawal of appellant's written statements to the police after such had already been admitted, to the prejudice of appellant."
 As mentioned in our analysis for the previous assignment of error, the trial court denied appellant's motion to suppress his statements given to the police. Because of this, the state's witnesses were permitted to extensively testify before the jury to the contents of his statements. The state moved for the admission of the two written statements given by appellant on May 11, 1999 and May 12, 1999. The court admitted these statements. The following Monday, the state requested these statements be withdrawn from evidence. The court granted this request.
The admission of evidence is within the sound discretion of the trial court. State v. Kinley (1995), 72 Ohio St.3d 491, 497. That decision may not be overturned by a reviewing court absent a showing of an abuse of that discretion. Peters v. Ohio State Lottery Comm. (1992),63 Ohio St.3d 296, 299.
Appellant objected to the withdrawal of these statements. Appellant argued then, as he does today, that the jury should have been allowed to have the statements before it, so it could see the exact language of the statements.
The state was able to present witnesses to testify regarding appellant's statements. The state was also permitted, if it met the additional evidentiary hurdles, to introduce the actual statements into evidence. These statements, when offered by the state, were admissions by a party-opponent, which are definitionally not hearsay pursuant to Evid.R. 801(D)(2).
However, when appellant attempted to have his own statements admitted, the statements to police are hearsay. Evid.R. 801(C). The statements were no longer of a "party-opponent," rather, they were statements made by the party offering them. These statements were out of court, and they were being offered to prove the truth of the matter asserted, i.e. where appellant was at certain times on the night of his grandfather's death.
Appellant did not testify at trial. To allow statements to the police to be admitted into evidence, without the person who gave the statement testifying, would, in effect, allow witnesses to testify to the police. Although they may be signed, statements given to the police are not under oath and are not subject to cross-examination. Finally, they are not made before a jury, so the jury does not have the opportunity to read the mannerisms of the witness to determine his or her credibility.
The trial court did not abuse its discretion by excluding appellant's statements. Appellant's fourth assignment of error is overruled.
Appellant's second assignment of error is:
 "The trial court erred by admitting fingerprint evidence."
 The police found a single latent fingerprint on the gun that was used to kill the victim. A motion in limine was filed to prohibit the fingerprint evidence, and a hearing was held on the issue.
When determining the admissibility of scientific evidence, the Supreme Court of Ohio in Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607, adopted the test set forth by the United States Supreme Court in Daubertv. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579. The Daubert
court stated that a court must analyze the testimony and determine if the reasoning or methodology used is scientifically valid. Miller, at 611, citing Daubert, at 592-593. The court went on to state "[i]n evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subject to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology used has gained general acceptance." Id. at 611, citing Daubert, at 593-594.
The Supreme Court of Ohio has recognized the use of fingerprints for identification purposes in criminal cases, stating "[f]ingerprints corresponding to those of the accused are sufficient proof of his identity to sustain his conviction, where the circumstances show that such prints, found at the scene of the crime, could only have been impressed at the time of the commission of the crime." State v. Miller
(1977), 49 Ohio St.2d 198, syllabus.
At the motion in limine hearing, appellant had an expert witness testify about the potential problems that can be associated with fingerprint evidence. The court heard this evidence and decided to allow the admission of the fingerprint evidence. Further, at trial, the state's witness was cross-examined about the potential for error in fingerprint analysis.
Fingerprint evidence is admissible if it can meet the test set forth inDaubert and adopted by Miller. Hence, the trial court did not abuse its discretion by denying the motion in limine regarding the fingerprint evidence.
Appellant further objects to the scientific reliability of the fingerprint evidence in this case, arguing that the latent fingerprint found on the gun was small. However, the size of the fingerprint goes to the weight to be given to the evidence, not to the admissibility of the evidence.
Appellant's second assignment of error is without merit.
Appellant's sixth assignment of error is:
 "The trial court abused its discretion by admitting photographs over the objection of trial counsel and to the prejudice of the appellant."
 There were seven photographs of the victim's body taken during the autopsy that were admitted into evidence. Again, the trial court has broad discretion in determining the admissibility of evidence.
The Supreme Court of Ohio has recently stated the following in regard to the admissibility of photographs in a murder case:
 "Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's discretion. State v. Landrum (1990), 53 Ohio St.3d 107, 121; State v. Maurer (1984), 15 Ohio St.3d 239, 264. Nonrepetitive photographs in capital cases, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. Id. paragraph seven of the syllabus; * * *" (Parallel citations omitted.) State v. Nields (2001), 93 Ohio St.3d 6, 25-26.
 Although no picture of a murder victim is pleasing, whether or not it is gruesome is a separate inquiry. The Supreme Court of Ohio held that pictures of a homicide victim showing knives stuck into his torso were not particularly gruesome, while, in the same case, held that pictures of a second victim, showing the victim with pieces of her brain next to her, were gruesome. State v. Tibbetts (2001), 92 Ohio St.3d 146, 156. In light of this holding, we do not feel that the photographs admitted in this case were particularly gruesome.
All of the autopsy photographs admitted into evidence, except for state's exhibits 14a and 14b, show a different angle or a different wound. Since they are from different angles to show the location of various gunshot wounds, they are not cumulative. Id. at 156. State's exhibits 14a and 14b are nearly identical, as both depict a gunshot wound in the victim's back. The only difference in these photographs is that exhibit 14a has a slender object inserted through the wound that is depicted in exhibit 14b. Although these pictures are somewhat cumulative, the addition of the object in the wound could have aided the trier of fact in determining the likely path of the bullet that caused this injury. Therefore, the probative value to the trier of fact outweighed the prejudice of showing the nearly identical photographs.
Appellant argues he did not dispute that gunshot wounds caused the death of the victim, but only disputed that he caused these wounds. However, "[t]he fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible." State v.Maurer, 15 Ohio St.3d at 265.
These pictures had a great deal of probative value. There were numerous people who testified that the gun was positioned under the victim's hand, in an apparent attempt to make the situation appear to be a suicide rather than a homicide. The state had the burden to show that the incident was a homicide. The pictures could have assisted the trier of fact in determining this issue. In this case, as in any murder case, pictures of the victim have a prejudicial effect on the accused. However, the trial court did not abuse its discretion in admitting these photographs, as the probative value outweighed the prejudicial effect.
Appellant's sixth assignment of error is overruled.
The seventh assignment of error appellant raises is:
 "The trial court committed plain error by interrogating a witness in a manner which suggested bias, prejudice, or prodding the witness to elicit partisan testimony."
 Appellant argues that the trial court committed plain error when it questioned Sgt. Gerald Lynch. Appellant claims that the court was not impartial and that he was biased by this line of questioning to Sgt. Lynch.
Evid.R. 614(B) allows a trial court to question witnesses, and states "[t]he court may interrogate witnesses, in an impartial manner, whether called by itself or by a party." "The right to question witnesses pursuant to Evid.R. 614(B) rests within the sound discretion of the trial court." State v. Williams (Dec. 24, 1998), Trumbull App. No. 97-T-0148, unreported, 1998 Ohio App. LEXIS 6299, at *22, citing State v. Prokos
(1993), 91 Ohio App.3d 39, 44.
This court has previously addressed the trial court's role in questioning witnesses during a trial:
 "`Evid.R. 614(B) permits a trial judge to interrogate a witness as long as the questions are relevant and do not suggest a bias for one side or the other. * * * Absent a showing of bias, prejudice, or prodding of the witness to elicit partisan testimony, it is presumed that the trial court interrogated the witness in an impartial manner in an attempt to ascertain a material fact or develop the truth. * * * A trial court's interrogation of a witness is not deemed partial for purposes of Evid.R. 614(B) merely because the evidence elicited during the questioning is potentially damaging to the defendant.'" (Emphasis in original and internal citations omitted.) Mentor v. Brancatelli (Dec. 5, 1997) Lake App. No. 97-L-011, unreported, 1997 Ohio App. LEXIS 5439, at *5-6, quoting State v. Blankenship (1995), 102 Ohio App.3d 534, 548.
 Sgt. Lynch is a member of the Painesville Police Department and was one of the officers who reported to the scene the night the victim's body was found. He testified about the condition of the victim's body. After direct and cross-examination, the following colloquy occurred between the court and Sgt. Lynch:
 "THE COURT: If I remember your direct testimony you said there was, I don't know whether you used the term wound, or abrasion, or something on the fingers?
 "LYNCH: Both, Your Honor. At one point when he was shot he must have had his hand up like this, (witness indicates), almost like to know.
 "THE COURT: That would be evidence of an attempt to defend himself or evidence of a struggle?
 "LYNCH: I wouldn't say, Your Honor. Certainly it could have been that, just been a natural reaction, no, don't shoot me, he saw it coming. I don't know whether you call it a struggle, but he definitely saw, at least, one of the rounds coming.
"THE COURT: Okay, Redirect?"
 The court was attempting to clarify the testimony of Sgt. Lynch. The injury to the victim's hand had already been brought up during the direct examination. Both sides questioned Sgt. Lynch about whether he believed that there was a struggle involved in the commission of this crime. Sgt. Lynch testified that there were not any signs of a struggle in the bedroom. The court was trying to clarify the implications of the unusual injury to the victim's hand.
Nothing in the court's line of questioning showed any bias toward appellant. The only reason that this line of questioning was damaging to appellant was it tended to show that this death was a homicide rather than a suicide. However, evidence that this crime was a homicide was brought out in other portions of Sgt. Lynch's testimony, as well as the testimony from other witnesses.
Appellant's seventh assignment of error is without merit.
Appellant's fifth assignment of error is:
 "The trial court abused its discretion by excluding the police statement given by Sandra Lawrence, to the prejudice of the appellant."
 Appellant asserts that the trial court erred when it excluded the police statement of Sandra Lawrence. Again, the decision to admit or exclude evidence is within the sound discretion of the trial court and may not be reversed absent a showing of an abuse of that discretion.
Ms. Lawrence was the victim's fiancée. She testified for the state at trial. She testified that the victim was at her house at 8:30 p.m. on May 10, 1999, when she returned from dinner with friends. However, in the oral statement she gave to the police on May 11, 1999, she stated that she last saw the victim at about 19:30 hours (7:30 p.m.) on May 10, 1999. She further informed the police that the victim told her that he was leaving to go home at 20:30 hours (8:30 p.m.). When confronted with this discrepancy on cross-examination, she stated that "I told the police that I arrived home from Friday's at around 8:30. I had seen Melvin earlier before I went to dinner." Patrolman David Simmons, of the Painesville Police Department, testified that he had used military time so often that he uses it when transcribing witnesses' statements. Ms. Lawrence testified that she is not familiar with military time.
Another inconsistency between the statement and her trial testimony is that in her statement she said the victim was leaving "to go home and get stuff ready for work in the morning." At trial, she testified that he was "was going to get a bite to eat." When confronted with these inconsistencies on cross-examination, she stated that "I think I said he was going to get a bite to eat and get his stuff ready for work. That's what he usually did."
The defense moved the court to admit Ms. Lawrence's statement to the police. The trial court did not admit this statement. Since this statement contained prior inconsistent statements of a witness, Evid.R. 613 is controlling and states:
 "(B) Extrinsic evidence of prior inconsistent statement of witness
 "Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
 "(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
 "(2) The subject matter of the statement is one of the following:
 "(a) A fact that is of consequence to the determination of the action other than the credibility of the witness;
 "(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(B) or 706;
 "(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence."
 Subpart (B)(1) was met, as Ms. Lawrence was given an opportunity to explain the inconsistencies during cross-examination. Subparts (B)(2)(b) and (c) are not relevant in this case.
The admissibility of this statement turns on whether subpart (B)(2)(a) has been met. The state argues that the sole consequence of admitting the statement was to attack the credibility of the witness. However, the subject matter of this statement has an additional consequence. Ms. Lawrence's testimony places the victim at her house at 8:30 p.m. If true, this directly contradicts the assertion defendant made in his police statement, that he last saw the victim at the victim's house at 8:30 p.m. The victim could not be both places at the same time. Therefore, if the jury believed Ms. Lawrence's testimony, it would have to disbelieve defendant's statement as to the last time he saw the victim. If the jury believed that the defendant gave a false statement to the police regarding his contact with the victim on the night the victim died, this would weigh heavily in favor of finding the defendant guilty.
Patrolman Simmons reduced the oral statement given by Ms. Lawrence to writing. At trial, the copy of this statement was unsigned. However, both Patrolman Simmons and Ms. Lawrence testified that she signed a copy. Patrolman Simmons also authenticated the document, by testifying that it was a true and accurate copy of the statement he took from Sandra Lawrence on the day in question. This was testimony of a witness with knowledge, which is one way to meet the authentication requirements of Evid.R. 901(A). See Evid.R. 901(B)(1). Ms. Lawrence also testified that this document was "pretty much" an accurate recording of the statement she gave to the police.
Since the document was properly authenticated, the only remaining issue regarding its admissibility is the "best evidence" rule. Generally, the original document is required. See Evid.R. 1002. However, an original is not required if it was in the possession of the opponent, the opponent was put on notice that the contents of it would be subject to proof at the hearing, and the opponent does not produce it. Evid.R. 1004(3). When the admissibility of this document was being argued outside the presence of the jury, defense counsel stated that the document at issue here was the copy that he was provided in discovery. Defense counsel accounted for the failure to provide an original and, thus, the document was admissible.
The court abused its discretion by excluding the statement given by Ms. Lawrence. Appellant's fifth assignment of error is sustained.
The third assignment of error raised by appellant is:
 "The trial court abused its discretion by admitting improper character evidence to the prejudice of the appellant."
 Appellant asserts that the trial court improperly allowed evidence of his character. Specifically, the court allowed evidence of the appellant's drug use and evidence that appellant had previously handled a gun.
Evid.R. 403(A), which pertains to relevant evidence, applies to this case, and states, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The Ohio Rules of Evidence differ from the Federal Rules in that Ohio Rule 403 is separated into subparts (A) and (B). Subpart (B), which pertains to undue delay or cumulative evidence, is discretionary and includes the same discretionary language that is in the federal rule "evidence may be
excluded." Subpart (A), however, is titled "exclusion mandatory," and states that "evidence is not admissible."
Paul Lyons, a friend of the deceased, testified that appellant handled one of the victim's guns a few months before the victim was shot. The gun he saw appellant handling was the victim's nine-millimeter. The victim was killed with his .38 caliber revolver. The defense asserts that the testimony that the victim has handled one of the victim's guns has no probative value, because it was not the gun used to kill the victim. We disagree. The fact that appellant had access to at least one of the victim's guns tends to show that appellant was more likely to have access to the gun used in this crime. This has probative value for two reasons. First, it could mean that appellant had access to the gun on the night in question and committed this offense. Second, it could also show that defendant had access to this gun on a prior occasion, and that is the reason his fingerprint was on the gun.
There was also some prejudice involved with the testimony, as it showed appellant handling one of the victim's guns. The testimony of Mr. Lyons indicated that the circumstances involved in handling the gun make it less prejudicial. Mr. Lyons testified that the victim knew that appellant had the nine-millimeter, and had asked for it back. Mr. Lyons testimony does not indicate how long appellant had the gun in his possession, only that appellant retrieved the gun from an upstairs bedroom. Mr. Lyons testified that, to his knowledge, the nine-millimeter had not left the house. Also, later in the trial, Sgt. Lutha testified that appellant, in his statement, admitted touching the nine-millimeter on a prior occasion.
The weighing of the probative value and the prejudice associated with the testimony is very close, perhaps equal. We do not consider that the probative value was "substantially outweighed" by the danger of prejudice, as required by Evid.R. 403(A). Therefore, the court did not err in allowing this testimony of Mr. Lyons.
In regards to drug use, two acquaintances of appellant testified for the state. Both of these individuals received reduced sentences in exchange for their testimony. One of the individuals, Jonathon King, testified on direct examination:
"Q: How long have you known [appellant]?
"A: Two and a half, three years.
"Q: Did you socialize, do things together?
"A: Yes.
"Q: What type of things would you do?
"A: Well, we drink together, smoke marijuana.
"MR. SZEMAN: Objection.
 "Q: (By Mr. Bartolotta) Just kind of hang out together, things like that?
"A: Yes."
 Whether appellant had smoked marijuana with Mr. King has no relevance as to whether he murdered the victim. It has no probative value at all. Further, it is highly prejudicial to appellant, as the state was able get evidence before the jury that appellant has used marijuana. This has nothing to do with the case. Here, the probative value of the testimony was substantially outweighed by the unfair prejudice to appellant. The trial court abused its discretion by admitting this testimony.
The second individual, Jameson Jeffries, testified on direct about his encounter with appellant on May 10, 1999, as follows:
 "Q: What happened when you undid the doors — unlocked the doors?
"A: [Appellant] started to get in.
"Q: What happened?
 "A: He tripped getting in, like almost fell in my car.
"Q: What happened next?
"A: Um, he got in.
 "Q: Did you have any conversation with him at that time?
"A: Yes, he asked me for a dub.
"MR. SZEMAN: Objection.
"THE COURT: Asked what?
"A: He asked me for a dub.
"Q. Well —
"THE COURT: I am going to overrule the objection.
 "Q: (By Mr. Culotta) Let me ask you first, before we go any further, Tyrone — strike that — can you explain for the members of the jury what a dub is?
 "A: It's somebody comes to a person with $20 and asked somebody for a dub, they usually get $40 of crack cocaine for $20."
 By overruling the objection of defense counsel, the trial court allowed the jury to hear evidence that appellant attempted to purchase crack cocaine. Mr. Jeffries stated that he did not sell appellant any crack cocaine. Although this was on the night of the crime, whether or not appellant attempted to purchase crack cocaine has nothing to do with whether he murdered the victim. No evidence was presented (such as the motive for the murder was robbery for drug money) that related these two events. This evidence about the attempted cocaine purchase has very little, if any, probative value. Also, it is very highly prejudicial to appellant, because it is additional evidence before the jury that defendant was a drug user.
The trial court abused its discretion by allowing this testimony relating to the attempted crack cocaine purchase, as any probative value is substantially outweighed by the prejudicial effect on appellant.
Mr. Jeffries also testified that, on the night of the murder, appellant appeared under the influence of a drug called "wet," which is marijuana or cigarettes dipped in embalming fluid and smoked. Mr. Jeffries then testified that a person on "wet" shows more aggressive behavior. He stated that appellant appeared aggressive on the night of the murder. Defense counsel objected to the questions regarding: Mr. Jeffries experience in drug use, his opinion as to whether appellant was under the influence of drugs on the night in question, and his opinion as to what those drugs were. All of these objections were overruled by the trial court.
Mr. Jeffries was not recognized by the court as an expert witness to testify under Evid.R. 702. Further, there was nothing in Mr. Jeffries' testimony to satisfy the requirements of Evid.R. 702(C), which requires the testimony be "based on reliable scientific, technical or other specialized information." Therefore, Mr. Jeffries' opinion testimony was that of a lay witness. Lay opinion testimony is limited to those opinions "which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." Evid.R. 701.
Courts have held that a lay person can testify on the subject of sobriety or lack thereof. See State v. Holland (Dec. 17, 1999), Portage App. No. 98-P-0066, unreported, 1999 Ohio App. LEXIS 6143, at *15. However, a police officer is not permitted to testify as to how many beers a person would have had to consume in a given time period to reach a certain blood alcohol level. State v. James (1980), 68 Ohio App.2d 227,229. The James court then held, "the question does not seek an opinion as to the effect resulting from a certain cause, but seeks an opinion as to the cause which results in a certain effect." Id. This is exactly the problem with what Mr. Jeffries did in this case. He testified to his opinion as to the cause (smoking "wet") which results in a certain effect (acting aggressively.)
Mr. Jeffries testified that he has observed people on "wet," and they tend to act more aggressively. The fact that appellant appeared to act aggressively on the night in question, standing alone, is not conclusive proof that he was under the influence of "wet." There are many other drugs, including alcohol, that can make people aggressive. Moreover, there are a substantial number of non-narcotic reasons that could make a person aggressive. Finally, many drugs, alcohol for instance, affect different people in different ways. After drinking alcohol, one individual may become violent, while another individual may become relaxed and subdued. There was no evidence presented that Mr. Jeffries had witnessed appellant using "wet" or that he was familiar with the way appellant acted while under the influence of "wet."
The Supreme Court of Ohio has recently held that "a drug user lay witness can establish his or her competence to express an opinion on the identity of a controlled substance if a foundation for this testimony is first established." State v. McKee (2001), 91 Ohio St.3d 292, 297. TheMcKee case, however, concerned an individual who actually saw the drugs. In this case, Mr. Jeffries was not identifying "wet." He did not testify that he witnessed appellant smoke "wet" on the night in question. Nor did he testify that he had ever watched appellant smoke "wet" at any time in the past. Yet, he was able to conclude that, because appellant acted aggressively, he was under the influence of "wet."
Mr. Jeffries was not identifying a certain drug that he saw. Nor was he merely testifying that appellant was intoxicated. He was giving his opinion to the cause of appellant's intoxication. This is beyond the scope of lay opinion testimony. The reason this opinion evidence is not admissible is that, since Mr. Jeffries did not see appellant use "wet," his opinion was not rationally based on his perception, as required by Evid.R. 701(1). Rather, the witness's opinion was based on an inference drawn by the witness. This is improper opinion evidence and should not have been admitted by the trial court. State v. McKee,91 Ohio St.3d at 296.
Appellant's third assignment of error, as relates it to the evidence concerning drugs, is sustained.
Appellant's eighth assignment of error is:
 "The appellant's conviction is against the manifest weight of the evidence."
 Having found merit to appellant's third and fifth assignments of error, this assignment of error is moot.
This court is most reluctant to substitute its judgment for that of a jury. Nowhere is that more evident than in a murder case. The stakes are high on both sides, and for the system to truly be effective, second-guessing must be kept to an absolute minimum. In most all circumstances, justice requires that the trier of fact be given a great deal of latitude in making decisions. Thus, in most cases of this magnitude, simple errors are not only expected, but excused, provided that there has been a fair trial overall.
In cases where the evidence of guilt is clear and unequivocal, an erroneous ruling on an evidentiary matter simply does not rise to the level of tipping the scales of justice. Where there are witnesses to the crime to be believed or not believed, each individual piece of evidence loses its singular ability to carry the day. If there are ten witnesses, and only one has been erroneously handled by the trial court, we believe justice has been served, in most instances.
However, in the instant matter, there are not ten witnesses. In fact, there are no witnesses to directly testify this defendant committed this crime. Instead, there are highly probative and relevant witnesses who presented circumstantial evidence that leads to the inference that this defendant was guilty. In such a situation, where the evidence of guilt is a close call, the trial court's evidentiary rulings carry far more potential for a miscarriage of justice.
The hard evidence before this jury was that the defendant was a narcotic-smoking grandson. It is not possible for a jury to be presented with this impermissible evidence and remain impartial. A man lies dead, and his grandson was a drug addict with a fingerprint on the murder weapon.
Take away the improper character assassination evidence, and what do you have? A key witness who testifies to a key time, and gives a different version to the police and the jury. It was clearly erroneous to not permit the jury to see the inconsistent statement given to the police. If the time was not important, why was the witness on the stand? It was important, and it was error to withhold that key piece of evidence from the jury.
With reluctance, it is the opinion of this court that the conviction in this matter was not the result of a fair trial. We offer no opinion as to the guilt or innocence of the defendant, for that is not our job. Having sustained appellant's third and fifth assignments of error, the judgment of the trial court is reversed and the case is remanded for a new trial in accordance with this opinion.
CHRISTLEY, J., concurs with Concurring Opinion, NADER, J., concurs.